Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued January 23, 2003       Decided March 18, 2003

No. 00-1262

SIERRA CLUB AND
NEW YORK PUBLIC INTEREST RESEARCH GROUP,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY AND
CHRISTINE TODD WHITMAN, ADMINISTRATOR,
U.S. ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENTS

On Petitioners' Motion for Attorney's Fees

*David S. Baron* argued the cause and filed the briefs for petitioners.

*David J. Kaplan*, Attorney, U.S. Department of Justice, argued the cause for respondents. With him on the brief was *Jan M. Tierney*, Attorney, U.S. Environmental Protection Agency.

---

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Before:  GINSBURG, *Chief Judge*, and ROGERS and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: The Clean Air Act authorizes an award of attorney's fees "whenever [the court] determines that such award is appropriate."  In this case, organizations that settled their Clean Air Act suit against the Environmental Protection Agency prior to adjudication on the merits move for an award of fees.  The EPA opposes the motion, arguing that only parties who obtain court-awarded relief may recover fees.  Applying relevant Supreme Court precedent, we hold that the Clean Air Act, unlike statutes that authorize fee awards only to "prevailing part[ies]," permits awards to so-called catalysts—parties who obtain, through settlement or otherwise, substantial relief prior to adjudication on the merits.  Because we find an award of fees "appropriate" under the circumstances of this case, we grant the motion.

## I.

Title V of the 1990 Amendments to the Clean Air Act, 42 U.S.C. §§ 7661–7661f, establishes procedures through which the Environmental Protection Agency may authorize states and localities to issue stationary air pollution source operating permits.  *See generally Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1017 (D.C. Cir. 2000).  Governors must submit proposals for state or locally administered permit programs "[n]ot later than 3 years after November 15, 1990," and the EPA must "approve or disapprove" the proposed programs within one year of receipt.  42 U.S.C. § 7661a(d)(1); *see also* 40 C.F.R. § 70.2 (specifying that "*State* means any non-Federal permitting authority, including any local agency").  If a program "substantially meets the requirements [for approval], . . . but is not fully approvable," the EPA may "grant the program interim approval," which "shall expire . . . not later than 2 years after such approval, and may not be renewed."  42 U.S.C. § 7661a(g).  If a state fails to meet Title V deadlines for obtaining program approval, however,

the EPA must itself "promulgate, administer, and enforce a program ... for that State." *Id.* § 7661a(d)(3), (g), (i)(4).

In 1992, the EPA promulgated 40 C.F.R. § 70.4(d)(2), which provided—in language virtually identical to Title V's—that "[i]nterim approval shall expire on a date set by the Administrator (but not later than 2 years after such approval), and may not be renewed." Four years later, in 1996, the EPA issued a rule that (1) appended a second sentence to 40 C.F.R. § 70.4(d)(2) providing that "[n]otwithstanding the previous sentence, the Administrator may, through rulemaking, provide for a longer period of time on an individual basis, but only once per State" and (2) extended most existing interim approvals by ten months. Operating Permits Program Interim Approval Extensions, 61 Fed. Reg. 56,368, 56,368, 56,370 (Oct. 31, 1996). Twice again, in 1997 and 1998, the EPA extended existing interim approvals. Extension of Operating Permits Program Interim Approvals, 62 Fed. Reg. 45,732 (Aug. 29, 1997); Extension of Operating Permits Program Interim Approval Expiration Dates, 63 Fed. Reg. 40,054 (July 27, 1998). Neither rule, however, cited any statutory or regulatory authority for the blanket extension. In fact, both rules expressly stated that the EPA was *not* acting pursuant to 40 C.F.R. § 70.4(d)(2), though the rules reserved the agency's purported authority to do so in the future. Roughly a week before the 1998 blanket interim approval would have expired, the EPA issued yet another rule, this time extending existing interim approvals for more than thirty states until December 1, 2001. Extension of Operating Permits Program, Interim Approval Expiration Dates, 65 Fed. Reg. 32,035 (May 22, 2000). Like the previous extension rules, this rule cited neither statutory nor regulatory authority for the blanket extension. Unlike the previous rules, however, it not only failed to expressly reserve the EPA's authority to offer additional extensions under 40 C.F.R. § 70.4(d)(2), but also gave "notice that no additional extensions of interim approval deadlines will be granted." *Id.* at 32,038.

Sierra Club and New York Public Interest Research Group filed a petition in this court challenging the EPA's May 22, 2000 rule as contrary to Title V. After Petitioners had filed

their opening brief and six days before the EPA's brief was due, the parties reached a settlement and filed a joint motion requesting a stay of proceedings. Under the settlement, the EPA agreed to (1) grant no further interim approval extensions; (2) remove the language from 40 C.F.R. § 70.4(d)(2) purportedly authorizing the EPA to extend interim approvals beyond two years on a case-by-case basis; (3) initiate a ninety-day formal notice-and-comment process for interested parties to identify deficiencies in both fully approved and interim programs; and (4) provide responses to all comments received through the notice-and-comment process. The settlement agreement provided that if the EPA breached any of its promises, Petitioners could ask the court to lift the stay and set a new briefing schedule. The settlement agreement also obligated the parties to seek joint dismissal if, by December 1, 2001, the EPA had fulfilled its promises. Dismissal, the agreement stated, would "provide an opportunity for Sierra Club to petition [this] Court for attorneys' fees within a reasonable period of time, which petition EPA may oppose."

In January 2002, after the EPA fulfilled its obligations under the settlement agreement, this court, at the parties' request, dismissed the case. Acting pursuant to the settlement agreement and citing CAA section 307(f), 42 U.S.C. § 7607(f), Petitioners then filed a motion requesting attorney's fees. Section 307(f) provides: "In any judicial proceeding under this section, the court may award costs of litigation (including reasonable attorney and expert witness fees) whenever it determines that such award is appropriate." *Id.*

Because the parties have agreed on the amount that the EPA will pay if this court rules for Petitioners, the only question before us is whether a fee award is appropriate in the first place. The EPA argues that section 307(f)'s "whenever . . . appropriate" standard does not authorize fee awards to parties, such as Petitioners, whose litigation produces no court-awarded relief. According to Petitioners, their role as a catalyst in halting the EPA's practice of serially extending interim approvals makes a fee award "appropriate."

**II.**

Whether Petitioners' role as a catalyst permits fee awards under section 307(f) turns on the meaning of two Supreme Court decisions. In *Ruckelshaus v. Sierra Club*, 463 U.S. 680 (1983), the Supreme Court held that section 307(f)'s "whenever . . . appropriate" standard prohibits awards to parties who *lose* on the merits. In *Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources*, 532 U.S. 598 (2001), the Court held that a different statutory standard, one that authorizes fee awards to "prevailing part[ies]," prohibits awards to catalyst parties, defined as those who "achieve[ ] the desired result[s] because the lawsuit[s] brought about . . . voluntary change[s] in the defendant[s'] conduct." *Id.* at 601. Because *Ruckelshaus* did not involve a catalyst party, and because *Buckhannon*, which did, concerned a different statute, neither case addresses the precise issue we face here. Even so, the parties, though they read *Ruckelshaus* and *Buckhannon* quite differently, agree that the two cases are dispositive, as do we.

*Ruckelshaus* began when this court found a fee award to be "appropriate" because the parties requesting fees, though having lost on the merits, had served as "expert and articulate spokesmen for environmental . . . interests" without whom "the process of judicial review might have been fatally skewed." *Sierra Club v. Gorsuch*, 672 F.2d 33, 41 (D.C. Cir. 1982). The Supreme Court reversed, explaining that "[i]t is difficult to draw any meaningful guidance from § 307(f)'s use of the word 'appropriate,' which means only 'specially suitable: fit, proper.'" *Ruckelshaus*, 463 U.S. at 683 (citation omitted). "Our basic point of reference," the Court said, "is the 'American Rule,'" under which parties bear their own attorney's fees. *Id.* at 683–84. The Court explained that although Congress has often departed from the American Rule by shifting fees from the "prevailing," "substantially prevailing," or "successful" party to the losing party, the additional departure of "shifting fees from the losing party to the winning party" would require "a clear showing that this result was intended." *Id.* at 684–85. Moreover, the Court explained, because section 307(f) "affects fee awards against

the United States, as well as against private individuals," it triggers the interpretive canon that "[w]aivers of immunity must be construed strictly in favor of the sovereign" and "not enlarged beyond what the language requires." *Id.* at 685 (internal quotation marks and citations omitted). Applying these two interpretive presumptions, the Court concluded that "the term 'appropriate' modifies but does not completely reject the traditional rule that a fee claimant must 'prevail' before it may recover attorney's fees." *Id.* at 686.

The Court found support for this conclusion in its analysis of the statute's legislative history. The Court began by quoting from a 1977 House Report stating that, "[i]n the case of the section 307 judicial review litigation, the purposes of the authority to award fees are not only to discourage frivolous litigation, but also to encourage litigation which will assure proper implementation and administration of the act or otherwise serve the public interest." *Id.* at 687 (quoting H.R. REP. NO. 95–294, at 337 (1977)). The Report goes on to explain, in language italicized by the Court, that "*[t]he committee did not intend that the court's discretion to award fees under this provision should be restricted to cases in which the party seeking fees was the 'prevailing party.'*" *Id.* Seeking to "determin[e] the meaning of [Congress's] rejection of the 'prevailing party standard,'" the Court then surveyed lower court decisions that had applied the "prevailing party" standard "in a variety of rather narrow ways," concluding that "[s]ection 307(f) was meant to expand the class of parties eligible for fee awards from prevailing parties to *partially prevailing parties*—parties achieving *some success*, even if not major success." *Id.* at 687–88 (emphases in original).

The Court also quoted from the 1970 Senate Report on CAA section 304(d), upon which section 307(f) was modeled, noting that "[b]ecause . . . §§ 304(d) and 307(f) have similar meanings, the history of § 304 is relevant to a construction of § 307(f)." *Id.* at 692 n.13. The quoted Senate Report explains that "[t]he Courts should recognize that in bringing *legitimate actions* under this section citizens would be performing a public service and in such instances the courts should award costs of litigation to such party." *Id.* at 686 n.8

(quoting S. REP. NO. 91–1196, at 38 (1970)) (emphasis in original). The Report then explains that fee awards "should extend to plaintiffs in actions which result in successful abatement but do not reach a verdict. For instance, if as a result of a citizen proceeding and before a verdict is issued, a defendant abated a violation, the court may award litigation expenses borne by the plaintiffs in prosecuting such actions." *Id.* Analyzing the Senate Report, the Court concluded in footnote eight—a passage central to our view of the instant case—that

> Congress found it necessary to explicitly state that the term appropriate "extended" to suits that forced defendants to abandon illegal conduct, although without a formal court order; this was no doubt viewed as a somewhat expansive innovation, since, under then-controlling law, some courts awarded fees only to parties formally prevailing in court. We are unpersuaded by the argument that this same Congress was so sure that "appropriate" also would extend to the far more novel, costly, and intuitively unsatisfying result of awarding fees to unsuccessful parties that it did not bother to mention the fact. If Congress had intended the far-reaching result urged by respondents, it plainly would have said so, as is demonstrated by Congress' careful statement that a *less* sweeping innovation *was* adopted.

*Id.* (internal citation omitted) (emphases in original).

*Buckhannon* involved a motion for fees under the Fair Housing Amendments Act and the Americans with Disabilities Act, both of which authorize courts to grant "the prevailing party . . . a reasonable attorney's fee." 42 U.S.C. §§ 3613(c)(2), 12205. The plaintiff brought a preemption challenge to a state law, but the action became moot after the state legislature repealed the allegedly preempted law. Even though the court never ruled on the merits, the plaintiff sought an award of attorney's fees, arguing that its suit was the catalyst for the repeal.

The Supreme Court began its analysis by observing that "the term 'prevailing party' " is "a legal term of art." *Buck-*

*hannon*, 532 U.S. at 603. Quoting from *Black's Law Dictionary*, the Court explained that "prevailing party" means "[a] party in whose favor a judgment is rendered." *Id.* Surveying its own precedents involving "prevailing party" fee-shifting statutes, the Court observed that it had never approved an award of attorney's fees without some degree of formal success, concluding:

> A defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial *imprimatur* on the change. Our precedents thus counsel against holding that the term "prevailing party" authorizes an award of attorney's fees *without* a corresponding alteration in the legal relationship of the parties.

*Id.* at 605 (emphasis in original). Turning to legislative history, the Court found it "at best ambiguous as to the availability of the 'catalyst theory' for awarding attorney's fees." *Id.* at 608. Although the Court also briefly discussed the parties' various policy arguments, it concluded that, "[g]iven the clear meaning of 'prevailing party' in the fee-shifting statutes, we need not determine which way these various policy arguments cut." *Id.* at 610. At no point in the opinion did the Court discuss *Ruckelshaus*, much less cite it.

It is on the field of *Ruckelshaus* and *Buckhannon* that the parties in this case do battle. According to the EPA, section 307(f)'s plain language and legislative history, interpreted in light of the canons of construction employed in *Ruckelshaus*, require that, to be eligible for a fee award, a party must have received some form of court-awarded relief. *Ruckelshaus*'s footnote eight discussion of the catalyst theory, the EPA insists, is *dictum*. The EPA also contends that because *Ruckelshaus* says that section 307(f) applies only to fully and "partially prevailing parties," 463 U.S. at 688, *Buckhannon*'s rejection of the catalyst theory for "prevailing party" statutes applies to section 307(f) as well. Petitioners have a very different view of these two cases. They argue that *Ruckelshaus*'s footnote eight interpretation of section 307(f) controls.

*Buckhannon*, they insist, applies only to "prevailing party" fee-shifting provisions.

Were we operating on a clean slate concerning section 307(f)'s meaning, we would accept the EPA's invitation to apply standard tools of statutory construction, including *Ruckelshaus*'s presumptions against inferring departures from the American Rule and waivers of sovereign immunity. Our slate, however, is far from clean, for in resolving the issue before it in *Ruckelshaus*, the Supreme Court engaged in an analysis of section 307(f) and its legislative history that determines the outcome of the catalyst issue we face here. Specifically, *Ruckelshaus* interprets the 1970 Senate Report as demonstrating that Congress did in fact authorize fee awards under section 307(f) for "suits that forced defendants to abandon illegal conduct, although without a formal court order." 463 U.S. at 686 n.8. The Court explained that the "*less* sweeping innovation" (recovery without formal court order) "*was* adopted," while the more "far-reaching result" (recovery by parties losing on the merits) was not. *Id.* (emphases in original). The EPA resists this interpretation, but neither in its brief nor at oral argument—where we spent considerable time on the topic—was it able to offer any interpretation of the "less sweeping innovation" that Congress adopted other than the catalyst theory. *Id.*

At bottom, the EPA's only real argument against treating footnote eight as controlling authority is to dismiss it as *dictum*. For this "inferior Court[ ]," U.S. Const. art. III, § 1, cl. 1, however, that argument carries no weight since "carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative." *United States v. Oakar*, 111 F.3d 146, 153 (D.C. Cir. 1997) (internal quotation marks and citation omitted); *see also Bangor Hydro–Elec. Co. v. FERC*, 78 F.3d 659, 662 (D.C. Cir. 1996) ("It may be *dicta*, but Supreme Court *dicta* tends to have somewhat greater force—particularly when expressed so unequivocally.").

Moreover, we are not at all certain that footnote eight is *dictum*. The footnote's logic is this: (1) We know Congress

authorized catalyst fee recoveries because it said so; therefore (2) we assume Congress rejected losing party recoveries because it remained silent on the issue. To reject the validity of the first proposition—as the EPA urges—would pull the rug from under footnote eight. To be sure, footnote eight is only one among several justifications that *Ruckelshaus* gives for its ultimate holding, but we "cannot ignore the unmistakable import of [a Supreme Court decision's] analysis." *Oakar*, 111 F.3d at 153.

Our understanding of *Ruckelshaus* also comports with the Supreme Court's conclusion, this time in true *dictum*, that nearly-identical "whenever . . . appropriate" language in the pre–1987 Clean Water Act authorizes fee awards in cases where the plaintiff obtains no court-awarded relief. In *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49 (1987), the Court held that citizens may sue under the Clean Water Act only for present, not past, statutory violations. Discussing the possibility that statutory violators could strategically moot enforcement actions by complying with the statute after the actions had been filed, the Court observed not only that mootness doctrine provides plaintiffs with certain protections against game-playing violators, but also that

> Under the Act, plaintiffs are . . . protected from . . . suddenly repentant defendant[s] by the authority of . . . district courts to award litigation costs "whenever the[y] . . . determine[ ] such award[s] [are] appropriate." 33 U.S.C. § 1365(d). The legislative history of this provision states explicitly that the award of costs "should extend to plaintiffs in actions which result in successful abatement but do not reach a verdict. For instance, if as a result of a citizen proceeding and before a verdict is issued, a defendant abated a violation, the court may award litigation expenses borne by the plaintiffs in prosecuting such actions." S. REP. NO. 92–414, p. 81 (1971), 2 Leg. Hist. 1499.

*Id.* at 67 n.6; *see also Save Our Cumberland Mountains, Inc. v. Hodel*, 826 F.2d 43, 51 (D.C. Cir. 1987) (reviewing the district court's award of attorney's fees under another "whenever . . . appropriate" fee-shifting provision and concluding that "as the decisions under other fee statutes indicate, to permit a fee award a party's litigation efforts need not be the demonstrably exclusive cause of the relief it sought; rather, the party may receive an award for time spent on activities that served as a 'catalyst' or contributing factor to that result").

Nothing in *Buckhannon* alters our conclusion that *Ruckelshaus*'s footnote eight controls the issue now before us. Although *Buckhannon* rejected the catalyst theory, the statute at issue there authorizes fee awards only to "prevailing part[ies]." By comparison, *Ruckelshaus*'s footnote eight analysis directly applies to the issue we face here, as it interprets section 307(f) to authorize fee awards for "suits that forced defendants to abandon illegal conduct, although without a formal court order." 463 U.S. at 686 n.8.

The most one can say of *Buckhannon* is that it impliedly casts doubt on footnote eight. The EPA takes just this position. Reading *Buckhannon*'s conclusion that "prevailing" means being "awarded some relief by the court," 532 U.S. at 603, in light of *Ruckelshaus*'s statement that "[s]ection 307(f) was meant to expand the class of parties eligible for fee awards from prevailing parties to partially prevailing parties," 463 U.S. at 688 (emphasis omitted), the EPA argues that section 307(f) requires some court-awarded relief. Even setting aside footnote eight, however, we think this inference quite dubious. The fact that the Supreme Court held in the context of a fully adjudicated claim that the "whenever . . . appropriate" standard expands the class of eligible parties to those who partially prevail on the merits does not address the status of parties who obtain significant success without adjudication. Even were we to accept the EPA's interpretation of "partially prevailing parties," the passage from *Ruckelshaus* that the EPA relies on is entirely consistent with the possibility that section 307(f) expands the class from prevailing parties to "partially prevailing parties" *and* to parties achiev-

ing no formal court-awarded success (a possibility footnote eight later confirms). Moreover, because the Supreme Court has warned against "dissect[ing] the sentences of the United States Reports as though they were the United States Code," *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993), we think it inappropriate to read a "prevailing party" requirement into section 307(f) just because the *Ruckelshaus* Court, not Congress, used that term.

In the end, we need not decide whether *Buckhannon*— which never so much as mentions *Ruckelshaus*—impliedly overrules footnote eight, for *Buckhannon*'s failure to do so expressly is dispositive. If "a precedent of [the Supreme Court] has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). Here, the case that "directly controls" is *Ruckelshaus.* Whether *Ruckelshaus* "rest[s] on reasons rejected" by *Buckhannon* is a matter for the Supreme Court, not us.

Our two sister circuits to have addressed the relationship between *Ruckelshaus* and *Buckhannon* have reached the same conclusion. In *Loggerhead Turtle v. County Council*, 307 F.3d 1318 (11th Cir. 2002), the Eleventh Circuit relied on *Ruckelshaus* for the proposition that catalyst recoveries are permitted by "whenever . . . appropriate" statutes and distinguished *Buckhannon* as applying only to "prevailing party" statutes, specifically noting that "*Buckhannon* makes no reference whatsoever to *Ruckelshaus* or to the 'whenever . . . appropriate' class of fee-shifting statutes." *Id.* at 1326. In *Center for Biological Diversity v. Norton*, 262 F.3d 1077, 1080 n.2 (10th Cir. 2001), although the parties did not raise the issue, the Tenth Circuit distinguished *Buckhannon* as applying only to "prevailing party" statutes.

The EPA's two remaining arguments require little discussion. The agency claims that allowing catalyst recoveries under section 307(f) will "create an unnecessary patchwork

among fee-shifting statutes," since *Buckhannon* prohibits such recoveries under the "prevailing party" standard. Respondents' Br. at 13. The simple and dispositive answer to this argument is *Ruckelshaus*, which tells us that Congress enacted section 307(f)'s "whenever . . . appropriate" language for two reasons: to "reject[ ] . . . the 'prevailing party' standard," 463 U.S. at 687, and to authorize fee awards to parties "that forced defendants to abandon illegal conduct, although without a formal court order," *id.* at 686 n.8. It was thus Congress that created the "patchwork."

The EPA's other argument suffers essentially the same defect. The agency claims that the catalyst theory would "embroil courts in a second major litigation" over whether plaintiffs caused defendants' changes in conduct. Respondents' Br. at 14. It is true that *Buckhannon* notes that one policy argument against the catalyst theory is that it might "spawn[ ] a second litigation of significant dimension." 532 U.S. at 609 (internal quotation marks and citation omitted). Yet in the very next paragraph, *Buckhannon* points out that, in light of clearly expressed Congressional intent, "we need not determine which way these various policy arguments cut." *Id.* at 610. The same is true here. *Ruckelshaus* establishes that Congress, by enacting section 307(f), intended for courts to decide when fee awards, even in the catalyst context, are "appropriate."

### III.

Having held that the "whenever . . . appropriate" standard authorizes recovery under a catalyst theory, we turn to the question of whether such an award is "appropriate" in this case. On this issue, *Buckhannon* provides useful guidance. Though the Court split five to four on the propriety of catalyst recovery under the "prevailing party" standard, all nine Justices agreed, albeit in *dictum*, on the correct standard for whether a lawsuit qualifies as a catalyst. In a passage arguing that the majority should have given greater weight to lower court decisions approving catalyst recoveries,

the dissent synthesized decisions that had articulated the standard:

> The array of federal court decisions applying the catalyst rule suggested three conditions necessary to a party's qualification as "prevailing" short of a favorable final judgment or consent decree. A plaintiff first had to show that the defendant provided "some of the benefit sought" by the lawsuit. Under most Circuits' precedents, a plaintiff had to demonstrate as well that the suit stated a genuine claim, *i.e.*, one that was at least "colorable," not "frivolous, unreasonable, or groundless." Plaintiff finally had to establish that her suit was a "substantial" or "significant" cause of defendant's action providing relief. In some Circuits, to make this causation showing, plaintiff had to satisfy the trial court that the suit achieved results "by threat of victory," not "by dint of nuisance and threat of expense." One who crossed these three thresholds would be recognized as a "prevailing party" to whom the district court, "in its discretion," could award attorney's fees.

*Id.* at 627–28 (Ginsburg, J., dissenting) (citations omitted). Not only did the majority express no disagreement with this statement of the law, but, citing the dissent, it said that it did "not doubt the ability of district courts to perform the nuanced 'three thresholds' test *required* by the 'catalyst theory'—whether the claim was colorable rather than groundless; whether the lawsuit was a substantial rather than an insubstantial cause of the defendant's change in conduct; whether the defendant's change in conduct was motivated by the plaintiff's threat of victory rather than threat of expense." *Id.* at 610 (emphasis added). Although the majority summarized the three thresholds somewhat differently—failing to mention the "some of the benefit sought" element and treating "causation" and "threat of victory rather than threat of expense" as separate elements rather than two aspects of the same element—nothing suggests that the majority disagreed

with the dissent's position that only a plaintiff achieving "some of the benefit sought" is entitled to fees.

Judged against this so-called three thresholds test, Petitioners' fee motion is easily resolved. Nowhere does the EPA suggest that Petitioners' motion fails to satisfy the second and third thresholds, and for good reason: Petitioners' claim was obviously colorable and their suit quite clearly caused the EPA to accept the settlement's terms. *Cf. Save Our Cumberland Mountains*, 826 F.2d at 51 ("[T]he temporal sequence of plaintiff's litigation followed by defendant's remedial activity is strong evidence of a causal relationship."). Thus, we need only consider the first threshold: Did the settlement provide Petitioners "some of the benefit sought"? *Buckhannon*, 532 U.S. at 627 (Ginsburg, J., dissenting) (internal quotation marks and citation omitted).

Answering no, the EPA points out that the settlement agreement did not require it to withdraw the May 22, 2000 rule, but instead allowed the interim approvals to lapse in December 2001, just as the rule provided. Although this is true, it establishes only that Petitioners failed to achieve *all* the relief sought, not that they achieved *none*. By arguing that Title V expressly forbade interim approval extensions lasting more than two years, Petitioners necessarily sought more than just invalidation of the EPA's specific rule. A court order invalidating the EPA's May 22 rule based on Petitioners' interpretation of Title V would also—whether expressly or impliedly—have invalidated any regulation or other rule permitting extensions lasting more than two years. Thus, since the settlement agreement (1) prohibited the EPA from granting additional interim approvals past December 2001 and (2) required the EPA to amend 40 C.F.R. § 70.4(d)(2), Petitioners unquestionably achieved some of the relief they sought.

The EPA's arguments to the contrary are unpersuasive. The agency contends that the settlement agreement's prohibition against further interim approval extensions was redundant because the May 22 rule gave notice that the EPA would offer no further interim approvals. As the record demonstrates, however, the EPA's promise was not binding. For example, in 1995 the agency granted Title V interim approval extensions in Delaware and Wisconsin, subject to the caveat

that the extensions would "not be renewed." Title V Clean Air Act Final Interim Approval of Operating Permits Program; State of Delaware, 60 Fed. Reg. 62,032, 62,033 (Dec. 4, 1995); Clean Air Act Final Interim Approval of the Operating Permits Program; Wisconsin, 60 Fed. Reg. 12,128, 12,136 (Mar. 6, 1995). Yet the 1997, 1998, and 2000 blanket extensions did just that. In contrast, the settlement agreement, like any relief that this court might have granted on the merits, bound the EPA.

Finally, the EPA argues that requiring it to amend 40 C.F.R. § 70.4(d)(2) does not constitute relief that Petitioners sought because the regulation "was not the basis for the May 22, 2000 extension challenged in this case." Respondents' Br. at 5 n.2; *see also id.* at 15. Not so. The EPA could have used the regulation, if left unchanged, to authorize further interim approval extensions, thereby frustrating Petitioners' basic goal of ending the agency's serial interim approval extensions.

## IV.

Because we hold that CAA section 307(f) authorizes awards of attorney's fees to catalyst parties, and finding an award "appropriate" under the circumstances of this case, we grant Petitioners' motion.

*So ordered.*