**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

DARLA KAYE WYNNE,
                        *Plaintiff-Appellee,*

v.

TOWN OF GREAT FALLS, SOUTH
CAROLINA, an incorporated town of
the State of South Carolina, County
of Chester; HENRY CLAYTON
STARNES, Mayor; JOHN BROOM,
Councilman; HENRY STEVENSON,
Councilman; BARBARA HILTON,
Councilwoman; RAYMOND H. BAKER,
Councilman,
                        *Defendants-Appellants,*

and                                                      No. 03-2069

JOE V. PENDERGRASS, Councilman,
                        *Defendant.*

_____

STATE OF SOUTH CAROLINA,
        *Amicus Supporting Appellant,*

THE AMERICAN JEWISH CONGRESS;
AMERICANS UNITED FOR
SEPARATION OF CHURCH AND STATE,
        *Amici Supporting Appellee.*

Appeal from the United States District Court
for the District of South Carolina, at Rock Hill.
Cameron McGowan Currie, District Judge.
(CA-01-3409-0)

Argued: June 2, 2004

Decided: July 22, 2004

Before MOTZ and KING, Circuit Judges, and
David R. HANSEN, Senior Circuit Judge of the
United States Court of Appeals for the Eighth Circuit,
sitting by designation.

_____

Affirmed by published opinion. Judge Motz wrote the opinion, in which Judge King and Senior Judge Hansen joined.

_____

## COUNSEL

**ARGUED:** Andrew Frederick Lindemann, DAVIDSON, MORRISON & LINDEMANN, P.A., Columbia, South Carolina, for Appellants. Herbert E. Buhl, III, Columbia, South Carolina, for Appellee. **ON BRIEF:** Brian M. Gibbons, HAMILTON, DELLENEY & GIBBONS, P.A., Chester, South Carolina, for Appellants. Henry Dargan McMaster, Attorney General, John W. McIntosh, Chief Deputy Attorney General, Robert D. Cook, Assistant Deputy Attorney General, C. Havird Jones, Jr., Senior Assistant Attorney General, Columbia, South Carolina, for Amicus Curiae State of South Carolina. Ayesha N. Khan, Legal Director, AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, Washington, D.C., for Amicus Curiae Americans United for Separation of Church and State. Marc D. Stern, AMERICAN JEWISH CONGRESS, New York, New York, for Amicus Curiae The American Jewish Congress.

_____

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

   Darla Kaye Wynne brought this suit to prohibit the Town Council of Great Falls, South Carolina from engaging in prayers that specifically invoke Jesus Christ during monthly council meetings. Following a bench trial, the district court entered judgment for Wynne, ruling that the "practice of members of Town Council invoking name(s) specifically associated with the Christian faith at Town Council meetings

violate[d] the Establishment Clause of the First Amendment to the United States Constitution." For the reasons that follow, we affirm.

I.

After consideration of all of the evidence, including the testimony of Darla Wynne and the Mayor of Great Falls, Henry Clayton Starnes, the district court made numerous findings of fact. It is upon these findings and the trial evidence that we base the account set forth below.[1]

First, the court found that "Town Council meetings always open with prayer," that the Mayor and all Council Members are Christian, and that Council Member John Broom "often" leads the prayer. The court further found that this prayer "frequently refers to Jesus, Jesus Christ, Christ or Savior in the opening or closing portion" of the prayer.

The Mayor agreed that a typical prayer opening a council meeting states:

> Our Heavenly Father we are here tonight to discuss town business. We ask that you would clear up our minds and our hearts from animosity that we might face these issues and address them with an open mind tonight. We pray that all decisions made tonight would be most beneficial for the town and the citizens.
>
> *In Christ's name we pray.*
>
> Amen (*in unison*).

(emphasis added). During the prayers, the court found that "citizens attending the meetings customarily stand and bow their heads." The record also contains uncontroverted evidence that residents of the Town participated in the prayers by saying "amen" at the end.

---

[1]The record in this case offers substantial support for each of the district court's findings. Perhaps for this reason, at oral argument the Town Council expressly disavowed a claim that any of these factual findings are erroneous.

Wynne, a citizen and resident of Great Falls and a follower of the Wiccan faith (an earth-based religion reconstructed from ancient Pagan beliefs), has regularly attended Council meetings since 1999. At trial, the Town Council conceded that Wynne "had a legitimate purpose for attending" these meetings "unrelated to her religion."

The district court found that initially Wynne "stood and bowed her head during the prayer" along with her neighbors. Wynne testified she did so because she felt "on the spot" and "wanted to show respect." For the next five consecutive Council meetings, she continued to stand and bow her head during the prayer. But, as the "references to Savior, Christ, Jesus, or Jesus Christ in the prayers continued," Wynne ultimately stopped. She explained that there were "a lot of 'amens,'" that "it was a very church environment," and that she became "most uncomfortable"; she believed a prayer "that mentions Jesus Christ [wa]s a promotion of the Christian religion," in which she did not believe.

Finally, at a Council meeting in late 2000, Wynne objected to the Town Council's practice of referring to "Jesus," "Christ," or "Jesus Christ" in its prayers. As an alternative, she "proposed that the prayer's references be limited to 'God'" or, instead, "that members of different religions be invited to give prayers." The district court found that Mayor Starnes responded at the meeting "to the effect that: 'This is the way we've always done things and we're not going to change.'"

Prior to the next Council meeting in February 2001, Council Member Barbara Hilton posted a message on the Town's website addressing Wynne's "request of alternative prayer," stating that she felt "it was imperative that we act[ ] quickly and decisively to Ms. Wynne's request" at the next meeting, and urging the Town's citizens to "call your council members and mayor with your opinions on this." Subsequently, several Christian ministers drafted letter resolutions on behalf of their members expressing support for continuance of a "Christian" prayer at Council meetings and "opposition to allowing an alternative prayer to a professed 'witch,'" and numerous citizens signed a petition urging the Council to "not stop praying to our God in heaven!" At the February meeting, the church ministers and members presented the letters and petitions to the Town Council. Many church members and ministers attended that meeting — the record

indicates that about 100 citizens were in attendance, as opposed to the usual "five or six," — and "hallelujahs," as well as "amens," were heard from the citizens following Broom's delivery of the Christian prayer. Wynne again asked for an "alternative" nonsectarian prayer, and the Town Council again refused her request, announcing that it would adhere to its customary prayer.

Wynne continued to attend Town Council meetings but, she testified, "it began to get hard." When she refused to stand during the Christian invocation, she heard a voice, which she believed was Councilman Broom's, state, "Well, I guess some people aren't going to participate." Her fellow citizens then told Wynne she "wasn't wanted," and that she "should leave town"; they accused her of being a "Satanist," and threatened that she "could possibly be burned out." Wynne felt "very, very uncomfortable" and "a little scar[ed]."

Moreover, the district court found that Wynne's "efforts to participate in Town Council's meetings as a member of the public [were] adversely affected by her refusal to accept the Christian prayer tradition." At one Council meeting, the Council would not permit Wynne to participate after arriving a few minutes late to avoid the prayer, even though "she had signed up to speak at the meeting, and was listed on the agenda." More generally, Wynne testified that the Council limited her allotted speaking time, "ostracized" her, and "treated [her] differently" than other members of the community. She explained that she did not believe the Mayor took her seriously, and that he attempted to intimidate her.

On August 20, 2001, Wynne filed this action, naming the Town, the Mayor, and the council members (collectively hereinafter, "the Town Council" or "the Council"), as defendants. The complaint alleged that the Town Council's consistent practice of including a "Christian prayer ritual" in Town Council meetings violated the Establishment Clause of the First Amendment. Wynne sought an injunction ordering the Council to "cease and desist forthwith from holding any Christian prayers." She explained at trial that she did not want the Town Council "punished or anything else like that." She just asked "the court to decide that a generic deity such as 'God' . . . without a specific reference to a deity that is associated with one religion be invoked at these prayers so that all of my community could feel

welcome there," and she wouldn't "have to betray [her] faith" and no one else would "have to betray theirs."

On July 11, 2003, after the district court had followed the magistrate judge's recommendation and denied the Town Council's motion for summary judgment, the court conducted a bench trial. Six weeks later, the court issued its written opinion, granting judgment to Wynne and permanently enjoining the Town Council "from invoking the name of a specific deity associated with any one specific faith or belief in prayers given at Town Council meetings." The Town Council timely appealed.[2]

## II.

The Establishment Clause of the First Amendment, made applica-

---

[2]On June 23, 2003, a few weeks before the trial, the Town Council adopted a resolution setting forth a policy governing prayers at Council meetings. The Resolution provided, *inter alia*, that "[t]he invocation shall not contain or address any specific beliefs . . . of any specific religion." But, *after* adoption of the Resolution, Council Member Henry Stevenson told Wynne that things "would stay the same." Moreover, Mayor Starnes testified at the trial that the Resolution "would not prohibit any Town Council member from making specific reference to Jesus, Jesus Christ, or Christ in any prayer opening the Town Council meeting." He explained that he saw "nothing wrong with" the Council's invocation of "Jesus Christ," "Christ Our Lord," or "Christ the Savior" because he believed "Christ *is* God," though admittedly a "Christian God." (emphasis added). The Mayor further testified that ninety-nine percent of the people in the town are Christian, and that the prayers were not likely to change until someone of a different religion was elected to the Council. Although the Council never suggested that the Resolution might moot Wynne's request for injunctive relief, the district court independently considered the question and concluded that it did not. Councilman Stevenson's statement and the Mayor's trial testimony — both of which demonstrate that the Resolution does not discontinue the practice challenged by Wynne — would seem to require this conclusion. *See, e.g.*, *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 800 (4th Cir. 2001); *Steakhouse, Inc. v. City of Raleigh, N.C.*, 166 F.3d 634, 636 n.2 (4th Cir. 1999). On appeal, the Town Council does not contend to the contrary.

ble to the states and their political subdivisions through the Fourteenth Amendment, *see Everson v. Bd. of Educ.*, 330 U.S. 1, 15 (1947), commands that the Government "shall make no law respecting an establishment of religion." U.S. Const. amend I. Wynne contends that the Town Council's practice of invoking "Jesus Christ" at Council meetings violates the Establishment Clause by advancing the Christian religion. The Town Council counters that the Supreme Court's decision in *Marsh v. Chambers*, 463 U.S. 783 (1983), dictates that the prayers at issue here pass constitutional muster under the Establishment Clause.

In *Marsh*, the Court upheld the Nebraska legislature's practice of opening each session with a nonsectarian prayer led by a chaplain paid with public funds. The Court based this holding on an extensive historical inquiry, concluding that since members of the First Congress had authorized the appointment of paid chaplains only three days before agreeing to the language of the Establishment Clause, they could not have intended the Establishment Clause "to forbid what they had just declared acceptable." *Id.* at 786-90. The *Marsh* Court also pointed out that the "practice of opening sessions with prayer has continued without interruption ever since that early session of Congress" and has "been followed consistently in most of the states." *Id.* at 788-89.

"This unique history" led the Court to "accept the interpretation of the First Amendment draftsmen who saw no real threat to the Establishment Clause arising from a practice of prayer similar to that now challenged." *Id.* at 791. Thus, the Court concluded that "[t]o invoke Divine guidance on a public body entrusted with making the laws is not, *in these circumstances*, an 'establishment' of religion." *Id.* at 792 (emphasis added). The *Marsh* Court emphasized, however, that the legislative prayer at issue there did not attempt "to proselytize or advance any one, or to disparage any other, faith or belief." *Id.* at 794-95.

Six years later, the Supreme Court offered further guidance on the proper scope of the *Marsh* holding. In *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573 (1989), the Court explained that *Marsh* "recognized that not even the 'unique history' of legislative prayer can justify contemporary legislative prayers that

have the effect of affiliating the government with any one specific faith or belief." *Id.* at 603 (internal citations omitted). The Court further stressed that while *Marsh* may have found that history can "affect the constitutionality of *nonsectarian* references to religion by the government," the Court had never held that "history can[ ] legitimate practices that demonstrate the government's allegiance to a particular sect or creed." *Id.* (emphasis added). Thus, the *Allegheny* Court concluded:

> *Marsh* plainly does not stand for the sweeping proposition . . . that all accepted practices 200 years old and their equivalents are constitutional today. . . . The history of this Nation, it is perhaps sad to say, contains numerous examples of official acts that endorsed Christianity specifically. Some of these examples date back to the Founding of the Republic, but this heritage of official discrimination against non-Christians has no place in the jurisprudence of the Establishment Clause. Whatever else the Establishment Clause may mean (and we have held it to mean no official preference even for religion over nonreligion), it certainly means at the very least that *government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions).* The clearest command of the Establishment Clause is that *one religious denomination cannot be officially preferred over another.* There have been breaches of this command throughout this Nation's history, but they cannot diminish in any way the force of the command.

*Id.* at 603-05 (emphasis added) (internal quotation marks and citations omitted).[3]

---

[3]The Town Council's only response to *Allegheny*'s extended discussion of *Marsh* is to dismiss it as dicta. But as we and our sister circuits have frequently noted, with "inferior [c]ourt[s]," like ourselves, "that argument carries no weight since carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative." *Sierra Club v. E.P.A.*, 322 F.3d 718, 724 (D.C. Cir. 2003) (internal quotation marks and citation omitted); *McCalla v. Royal MacCabees Life Ins. Co.*, 369 F.3d 1128, 1132 (9th Cir. 2004); *Crowe v. Bol-*

Thus, *Marsh* and *Allegheny* teach that, in view of our Nation's long and "unique history," a legislative body generally may, without violating the Establishment Clause, invoke Divine guidance for itself before engaging in its public business. But *Marsh* and *Allegheny* also teach that a legislative body cannot, consistent with the Establishment Clause, "exploit" this prayer opportunity to "affiliate" the Government with one specific faith or belief in preference to others. With these principles in mind, we turn to the case at hand.

III.

The question before us is whether the Town Council's practice crossed the constitutional line established in *Marsh* and *Allegheny*. In view of the record in this case, and particularly the district court's factual findings, we can only conclude that the Council has crossed that line. Rather than engaging in the sort of "legislative prayer" approved of in *Marsh*, the Council has improperly "exploited" a "prayer opportunity" to "advance" one religion over others. *Marsh*, 463 U.S. at 794.

The prayers challenged here stand in sharp contrast to the prayer held not to constitute an "'establishment' of religion" in *Marsh*. In *Marsh*, the approved prayer was characterized as "nonsectarian" and "civil"; indeed, the chaplain had affirmatively "removed all references to Christ." *Marsh*, 463 U.S. at 793 n.14. Here, on the other hand, the prayers sponsored by the Town Council "frequently" contained references to "Jesus Christ,"[4] and thus promoted one religion over all others, dividing the Town's citizens along denominational lines.

*duc*, 365 F.3d 86, 92 (1st Cir. 2004); *Johnson v. McKune*, 288 F.3d 1187, 1199 (10th Cir. 2002); *United States v. City of Hialeah*, 140 F.3d 968, 974 (11th Cir. 1998); *Reich v. Cont'l Cas. Co.*, 33 F.3d 754, 757 (7th Cir. 1994); *Fouts v. Maryland Cas. Co.*, 30 F.2d 357, 359 (4th Cir. 1929). Moreover, *Allegheny*'s discussion of *Marsh* entirely accords with the limits the *Marsh* Court itself placed on its holding. *See Marsh*, 463 U.S. at 794-95 (explaining that legislative "prayer opportunity" must not be "exploited to proselytize or advance any one, or to disparage any other, faith or belief").

[4]*Marsh* noted that a court need not "embark on a sensitive evaluation or . . . parse the content of a particular prayer" when nothing indicates

The Supreme Court has long made clear that the Constitution pro-
hibits any such displays of "denominational preference" by the Gov-
ernment. *Larson v. Valente*, 456 U.S. 228, 244 (1982). Regardless of
the context or applicable "test," one "command of the Establishment
Clause" is absolutely "clear[ ]": "one religious denomination cannot
be officially preferred over another." *Id.*; *Allegheny*, 492 U.S. at 605
(embracing this as the "clearest command of the Establishment
Clause" when discussing the legislative speech approved in *Marsh*).
The Establishment Clause "at least" means that neither "a state nor the
Federal Government can . . . prefer one religion over another." *Ever-
son*, 330 U.S. at 15; *see also Bd. of Educ. v. Grumet*, 512 U.S. 687,
703 (1994) (explaining that this principle is "at the heart of the Estab-
lishment Clause"). With respect to this fundamental principle, there
is little disagreement. *See, e.g.*, *Lee v. Weisman*, 505 U.S. 577, 641
(1992) (Scalia, J., dissenting) (conceding "that our constitutional tra-
dition . . . [has] ruled out of order government-sponsored endorsement
of religion — even when no legal coercion is present, and indeed
even when no ersatz, 'peer-pressure' psycho-coercion is present —
where the endorsement is sectarian, in the sense of specifying details
upon which men and women who believe in a benevolent, omnipotent

---

that it has been used to "proselytize or advance" any one faith. 463 U.S.
at 794-95. In the analysis that follows, we have not engaged in any such
"parsing" but instead simply rely on the district court's factual finding
that the challenged prayers "frequently" invoked "'Jesus,' 'Jesus Christ,'
'Christ,' or 'Savior.'" As the Town Council conceded at oral argument,
a recognition that the prayers often included an invocation to Jesus Christ
does not constitute the "parsing" referred to in *Marsh*. We note, however,
that "pars[ing]" the prayers in this case would seemingly be permitted
under *Marsh*, for the record in this case is replete with powerful "indica-
tion[s]" that the Town Council did indeed "exploit" the prayer opportu-
nity "to proselytize or advance" one faith. These indications include the
findings that Wynne's refusal to accept the Christian prayer practice
adversely affected her efforts to participate in the Council meetings; that
the Council steadfastly rejected Wynne's requests to eliminate from the
prayers invocations to a deity recognized only by Christians; and that
members and ministers from several Christian churches, at a council
member's urging, presented letters and petitions to the Council, encour-
aging its decision to open its meetings with "Christian prayer" and
opposing "an alternative prayer to a self-proclaimed 'witch.'"

Creator and Ruler of the world are known to differ (for example, the divinity of Christ)").

If *Marsh* itself left any question as to whether the Court somehow intended to exempt invocations of deliberative public bodies from this "bedrock Establishment Clause principle," *Allegheny*, 492 U.S. at 605, the Court made clear in *Allegheny* that it had no such intention. Indeed, the *Allegheny* Court clarified that it only upheld the prayer in *Marsh* against Establishment Clause challenge because the *Marsh* prayer did *not* violate this nonsectarian maxim — "*because* the particular chaplain had 'removed all references to Christ.'" *Id.* at 603 (emphasis added) (quoting *Marsh*, 463 U.S. at 793 n.14). The Court in *Allegheny* explained that invocations "that have the effect of affiliating the government with any one specific faith or belief" or demonstrate "the government's allegiance to a particular sect or creed" do not fall within the category of legislative prayers justified by the "unique history" discussed in *Marsh*. *Id.*

Nevertheless, the Town Council argues that *Marsh*'s approval of a prayer "in the Judeo-Christian tradition," *Marsh*, 463 U.S. at 793, constitutes approval of prayers, like those at issue here, that invoke Jesus Christ, the Christian deity. The Town Council maintains that these prayers fall within the "Judeo-Christian tradition" because there is "no meaningful distinction between a reference to the Judeo-Christian God or 'Heavenly Father' and a reference to 'Jesus Christ.'" Brief of Appellant at 19. That argument misunderstands the term, "Judeo-Christian tradition," and misreads Supreme Court precedent.

As the district court pointed out, quoting Merriam-Webster's Collegiate Dictionary 633 (10th ed. 1999), a prayer in the "Judeo-Christian" tradition has "'historical roots in both Judaism and Christianity.'" *Accord* Random House Webster's Unabridged Dictionary 1036 (2d ed. 1998) (defining "Judeo-Christian" as "of or pertaining to the religious writings, beliefs, values or traditions *held in common* by Judaism and Christianity") (emphasis added); *see also Allegheny*, 492 U.S. at 604 n.53 (distinguishing the Judeo-Christian prayer approved in *Marsh* from "sectarian proclamations" that "demonstrate an official *preference* for Christianity, and a corresponding official *discrimination* against all non-Christians") (emphasis in original). The prayers sponsored by the Town Council have invoked a deity in

whose divinity *only* those of the Christian faith believe. This is not a "prayer within the embrace of what is known as the Judeo-Christian tradition," which is a "nonsectarian prayer" without "explicit references . . . to Jesus Christ, or to a patron saint" — references that can "foster a different sort of sectarian rivalry than an invocation or benediction in terms more neutral." *Lee*, 505 U.S. at 588, 589. Thus, we must reject the Town Council's contention that the *Marsh* Court's approval of a nonsectarian prayer "within the Judeo-Christian tradition" equates to approval of prayers like those challenged here, which invoke the exclusively Christian deity — Jesus Christ.[5]

We also find unpersuasive the Council's argument that, although its prayers frequently referred to Christ, because each did so only once, the prayers did not "advance" Christianity. The Council contends that in warning legislators against "exploit[ing]" a "prayer opportunity" to "proselytize or advance any one . . . faith or belief," *Marsh*, 463 U.S. at 794-95, the *Marsh* Court intended "advance" simply to be a synonym for "proselytize." *See* Brief of Appellant at 20; Reply Brief at 7-8. The Council maintains that "[a]ny other interpretation of 'advance' would render the use of the term 'proselytize' meaningless." Reply Brief at 8.

But "proselytize" and "advance" have different meanings and denote different activities. To "proselytize" on behalf of a particular religious belief necessarily means to seek to "convert" others to that belief, whereas to "advance" a religious belief means simply to "forward, further, [or] promote" the belief. Webster's Third New International Dictionary 30, 1821 (3d ed. 1993). Advancement *could* include "conversion" but it does not necessarily contain any "conversion" or "proselytization" element. Similarly, although proselytization cer-

---

[5]We note, further, that the Town Council has made no effort to balance its exclusively Christian references with any reference to a deity specifically associated with Judaism, nor has it ever included any credo-statements typically included in Jewish prayers, such as "Shema Yisrael." In fact, the Council has never invoked a deity associated with any specific faith other than Christianity. Indeed, although Wynne expressly and repeatedly requested that the Council either partake in nonsectarian prayers, or include in its prayers references to deities associated with other religions, the Council steadfastly refused to do so.

tainly involves some element of advancement, the word "proselytize" stresses conversion in a manner that the word "advance" does not. Thus, according each word — "proselytize" and "advance" — its particular, ordinary meaning does not render the other "meaningless."

Rather, to adopt the Town Council's contrary view and interpret "advance" as merely a synonym for "proselytize," would most certainly render the word "advance" meaningless, and would force us to ignore the *Marsh* Court's use of the disjunctive in cautioning against "proselytiz[ation] *or* advance[ment]" of a particular religious creed. 463 U.S. at 794. Adopting the Town Council's interpretation would also force us to ignore the Supreme Court's subsequent interpretation of the *Marsh* language in *Allegheny*. Rather than finding that this language refers only to prayers that "proselytize" a particular faith, as the Council argues, the Supreme Court has explained that *Marsh* prohibits "contemporary legislative prayers that have the effect of *affiliating* the government with any one specific faith or belief." *Allegheny*, 492 U.S. at 603 (emphasis added).[6]

---

[6]The Town Council and its amicus heavily rely on some dicta in *Snyder v. Murray City Corp.*, 159 F.3d 1227 (10th Cir. 1998) (en banc), to support their "'advance'-means-'proselytize'" argument. *Snyder* holds that a city council did not violate the Establishment Clause by denying a citizen permission to recite an aggressively anti-religious prayer prior to council meetings. This holding, and most of the *Snyder* court's discussion, entirely accord with our reasoning here. *Snyder* distinguishes, as we do, the "'Judeo-Christian,' 'non-sectarian' invocations," approved in *Marsh* from sectarian prayers like those at issue here, *id.* at 234 n.10, and quotes, as we do, the Supreme Court's conclusion that nonsectarian prayers, unlike sectarian prayers, do not have the "effect of affiliating the government with any one specific faith or belief." *Id.* at 1234 (quoting *Allegheny*, 492 U.S. at 603). But in a footnote, *Snyder* appears to ignore these principles, and posits that because "all prayers 'advance' a particular faith or belief in one way or another," *Marsh* must have prohibited only the "more aggressive form of advancement, i.e., proselytization." *Id.* at 1234 n.10. Both premise and conclusion are wrong. Not "all prayers" "'advance' a particular faith." Rather, nonsectarian prayers, by definition, do *not* advance a *particular* sect or faith. Moreover, as explained in the text above, *Marsh* prohibits prayers that "proselytize *or* advance" a particular faith, not just prayers that proselytize a particular faith. Thus, we find this statement from the *Snyder* court unpersuasive, and inconsistent with the plain language of *Marsh*.

Here, the Town Council insisted upon invoking the name "Jesus Christ," to the exclusion of deities associated with any other particular religious faith, at Town Council meetings in public prayers in which the Town's citizens participated.[7] Thus, the Town Council clearly "advance[d]" one faith, Christianity, in preference to others, in a manner decidedly inconsistent with *Marsh*.

In sum, we must reject the Town Council's arguments that *Marsh* renders the challenged prayers constitutional. *Marsh* does not permit legislators to do what the district court, after a full trial, found the Town Council of Great Falls did here — that is, to engage, as part of public business and for the citizenry as a whole, in prayers that contain explicit references to a deity in whose divinity only those of one faith believe. The invocations at issue here, which specifically call upon Jesus Christ, are simply not constitutionally acceptable legislative prayer like that approved in *Marsh*. Rather, they embody the precise kind of "advance[ment]" of one particular religion that *Marsh* cautioned against. Accordingly, we hold the district court did not err in finding that the challenged prayers violated the Establishment Clause and enjoining the Town Council "from invoking the name of

---

[7]The Town Council briefly contends that the prayers at issue here were "only and for the benefit of the Council members." Brief of Appellant at 22. Given the record evidence and unchallenged factual findings of the district court, that contention is simply untenable. The district court found that the Town Council specifically listed the prayers first on its agenda of public business and that citizens customarily participated in the prayers by standing and bowing their heads. Indeed, citizens actively joined in the prayers by declaring "amen" and sometimes "hallelujah" at the conclusion. Moreover, a Council member urged the Town's citizens to get involved in the prayer controversy, and a large number of the Town's citizenry and church leaders obviously felt that they had enough personal investment in the Council's "Christian prayer" to organize petitions and draft resolutions in support of it. Finally, in its June 2003 Resolution, the Town Council stated that the "invocation may request divine guidance for the *Town of Great Falls and its . . . citizens*," (emphasis added), and so itself has recognized that the Town's prayers are not just for the council members but for all of the Town's citizens. Thus, in a very real sense, the Town Council has directed Christian prayers at — and thereby advanced Christianity to — the citizens in attendance at its meetings and the citizenry at large.

a specific deity associated with any one specific faith or belief in prayers given at Town Council meetings."[8]

We note that this conclusion accords with the Supreme Court's apparent intent to confine its holding in *Marsh* to the specific "circumstances" before it — a nonsectarian prayer preceding public business, directed only at the legislators themselves. *Marsh*, 463 U.S. at 792. We also note that, in the more than twenty years since *Marsh*, the Court has never found its analysis applicable to any other circumstances; rather, the Court has twice specifically refused to extend the *Marsh* approach to other situations. *See Lee*, 505 U.S. at 596; *Allegheny*, 492 U.S. at 603. Similarly, we and our sister circuits have steadfastly refused to extend *Marsh*. *See, e.g.*, *Coles v. Cleveland Bd. of Educ.*, 171 F.3d 369, 381 (6th Cir. 1999); *North Carolina Civil Liberties Union Legal Found. v. Constangy*, 947 F.2d 1145, 1148-49 (4th Cir. 1991). Indeed, as the district court noted, the Town Council has not cited any case upholding prayers by legislative or other public bodies that explicitly invoke one religion in preference to others. We refuse to do so here. Such a holding would, we believe, be plainly contrary to "[t]he clearest command of the Establishment Clause . . . that one religious denomination cannot be officially preferred over another." *Larson*, 456 U.S. at 244; *accord Grumet*, 512 U.S. at 703; *Allegheny*, 492 U.S. at 604-05; *Everson*, 330 U.S. at 15.

IV.

Public officials' brief invocations of the Almighty before engaging in public business have always, as the *Marsh* Court so carefully explained, been part of our Nation's history. The Town Council of Great Falls remains free to engage in such invocations prior to Coun-

---

[8]The Town Council does not contend that its prayers withstand constitutional scrutiny under the test fashioned in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), the endorsement test, *Lynch v. Donnelly*, 465 U.S. 668, 690 (1984) (O'Connor, J., concurring), the neutrality test, *Rosenberger v. Rector of Univ. of Virginia*, 515 U.S. 819, 839 (1995), or the coercion test, *Lee*, 505 U.S. at 587. Indeed, the Town Council conceded at oral argument that it relied exclusively on *Marsh*, and thus if the challenged prayers did not equate to the constitutionally acceptable legislative prayer upheld in *Marsh*, its appeal failed.

cil meetings. The opportunity to do so may provide a source of strength to believers, and a time of quiet reflection for all. This opportunity does not, however, provide the Town Council, or any other legislative body, license to advance its own religious views in preference to all others, as the Town Council did here. The First Amendment bars such official preference for one religion, and corresponding official discrimination against all others. Accordingly, for the reasons set forth within, we affirm the judgment of the district court.

*AFFIRMED*