**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JANET JOYNER; CONSTANCE LYNN
BLACKMON,

*Plaintiffs-Appellees,*

and

MAUCK OSBORNE,

*Plaintiff,*

v.

FORSYTH COUNTY, NORTH
CAROLINA,

*Defendant-Appellant.*

No. 10-1232

THE RUTHERFORD INSTITUTE;
JUSTICE AND FREEDOM FUND; THE
FOUNDATION FOR MORAL LAW;
INDEPENDENCE LAW CENTER; NORTH
CAROLINA FAMILY POLICY COUNCIL;
PALMETTO FAMILY COUNCIL; THE
FAMILY FOUNDATION OF VIRGINIA;
THE FAMILY POLICY COUNCIL OF
WEST VIRGINIA; THE NORTH
CAROLINA PARTNERSHIP FOR
RELIGIOUS LIBERTY; RETIRED JUDGES
OF AMERICA; THE NATIONAL LEGAL
FOUNDATION,

*Amici Supporting Appellant,*

BAPTIST JOINT COMMITTEE FOR
RELIGIOUS LIBERTY; AMERICAN
JEWISH CONGRESS; ANTI-
DEFAMATION LEAGUE; BLUE
MOUNTAIN LOTUS SOCIETY; GURU
GOBIND SINGH FOUNDATION; HINDU
AMERICAN FOUNDATION; SIKH
COUNCIL ON RELIGION AND
EDUCATION,

*Amici Supporting Appellees.*

Appeal from the United States District Court
for the Middle District of North Carolina, at Greensboro.
James A. Beaty, Jr., Chief District Judge.
(1:07-cv-00243-JAB-PTS)

Argued: May 12, 2011

Decided: July 29, 2011

Before WILKINSON, NIEMEYER, and KEENAN,
Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the majority opinion, in which Judge Keenan joined. Judge Niemeyer wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** James Michael Johnson, ALLIANCE DEFENSE FUND, Shreveport, Louisiana, for Appellant. Katherine Lewis Parker, AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA LEGAL FOUNDATION, Raleigh, North Carolina, for Appellees. **ON BRIEF:** David A. Cortman, ALLIANCE DEFENSE FUND, Lawrenceville, Georgia; Bryce D. Neier, THE LAW OFFICE OF BRYCE D. NEIER, Fayetteville, North Carolina; David Gibbs, THE GIBBS LAW FIRM, Seminole, Florida, for Appellant. Ayesha N. Khan, AMERICANS UNITED, Washington, D.C.; Daniel Mach, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, Washington, D.C., for Appellees. John W. Whitehead, Douglas R. McKusick, THE RUTHERFORD INSTITUTE, Charlottesville, Virginia; James J. Knicely, Robert Luther III, KNICELY & ASSOCIATES, P.C., Williamsburg, Virginia, for The Rutherford Institute, Amicus Supporting Appellant. Deborah J. Dewart, Swansboro, North Carolina, for Justice and Freedom Fund, Amicus Supporting Appellant. Roy S. Moore, Benjamin D. DuPre, John A. Eidsmoe, FOUNDATION FOR MORAL LAW, Montgomery, Alabama, for The Foundation for Moral Law, Amicus Supporting Appellant. Randall L. Wenger, INDEPENDENCE LAW CENTER, Harrisburg, Pennsylvania; Scott W. Gaylord, Ph.D., ELON UNIVERSITY LAW SCHOOL, Greensboro, North Carolina, for Independence Law Center, Amicus Sup-

porting Appellant. Stuart D. Sloan, Franklin, North Carolina;
Matthew G. Gerrald, Columbia, South Carolina; Timothy D.
Savidge, Prosperity, South Carolina, for North Carolina Family Policy Council, Palmetto Family Council, The Family
Foundation of Virginia, The Family Policy Council of West
Virginia, and The North Carolina Partnership for Religious
Liberty, Amici Supporting Appellant. Robert L. Hodges, Matthew D. Fender, MCGUIREWOODS LLP, Richmond, Virginia, for Retired Judges of America, Amicus Supporting
Appellant. Steven W. Fitschen, Virginia Beach, Virginia, for
The National Legal Foundation, Amicus Supporting Appellant. Steven K. Hoffman, Emilie S. Kraft, JAMES & HOFFMAN PC, Washington, D.C.; K. Hollyn Hollman, James T.
Gibson, BAPTIST JOINT COMMITTEE FOR RELIGIOUS
LIBERTY, Washington, D.C., for Baptist Joint Committee for
Religious Liberty, Amicus Supporting Appellees. Evan M.
Tager, Archis A. Parasharami, Elisa F. Kantor, MAYER
BROWN LLP, Washington, D.C., for American Jewish Congress, Anti-Defamation League, Blue Mountain Lotus Society, Guru Gobind Singh Foundation, Hindu American
Foundation, and Sikh Council on Religion and Education,
Amici Supporting Appellees.

## OPINION

WILKINSON, Circuit Judge:

On December 17, 2007, Janet Joyner and Constance Lynn
Blackmon decided to attend a meeting of the Forsyth County
Board of Commissioners. Like all public Board meetings, the
gathering began with an invocation delivered by a local religious leader. And like almost every previous invocation, that
prayer closed with the phrase, "For we do make this prayer in
Your Son Jesus' name, Amen." The December 17 prayer also
made a number of references to specific tenets of Christianity,
from "the Cross of Calvary" to the "Virgin Birth" to the "Gospel of the Lord Jesus Christ."

In response, Joyner and Blackmon filed suit against the county, alleging that the December 17 prayer represented one instance of the Board's broader practice of sponsoring sectarian opening prayers at its meetings. After conducting a thorough review of the factual record, the district court concluded that the Board's legislative prayer policy did in fact violate the Establishment Clause by advancing and endorsing Christianity to the exclusion of other faiths.

The district court's ruling accords with both Supreme Court precedent and our own. Those cases establish that in order to survive constitutional scrutiny, invocations must consist of the type of nonsectarian prayers that solemnize the legislative task and seek to unite rather than divide. Sectarian prayers must not serve as the gateway to citizen participation in the affairs of local government. To have them do so runs afoul of the promise of public neutrality among faiths that resides at the heart of the First Amendment's religion clauses.

I.

The Forsyth County Board of Commissioners (the Board, for short) is the elected body that governs Forsyth County, North Carolina. The county has approximately 350,000 residents and encompasses the city of Winston-Salem. The Board's twice-monthly meetings are open to the public, and for years the Board has decided to start the meetings with a prayer and a recital of the Pledge of Allegiance.

Until 2007, the Board did not have a written policy regarding the prayers but followed a relatively routine practice. Using the Yellow Pages, internet research, and consultation with the local Chamber of Commerce, the clerk to the Board compiled and maintained the "Congregations List" — a database of all religious congregations with an established presence in the community. No eligible congregation was excluded, and any congregation could confirm its inclusion by writing to the clerk. Each November, the clerk would update

the list and then mail an invitation to the "religious leader" of each congregation. The letter informed those individuals that they were eligible to deliver an invocation and could schedule an appointment on a first-come, first-serve basis. The letter then closed as follows:

> This opportunity is voluntary, and you are free to offer the invocation according to the dictates of your own conscience. To maintain a spirit of respect and ecumenism, the Board requests only that the prayer opportunity not be exploited as an effort to convert others to the particular faith of the invocational speaker, nor to disparage any faith or belief different than that of the invocational speaker.

In order to ensure that a variety of religious leaders came forth, the Board decided not to schedule any leader for consecutive meetings or for more than two meetings in any calendar year.

Once a potential speaker accepted, the Board would add the invocation to the meeting agenda, often alongside the name of the individual giving the invocation, his congregation, and the location of his place of worship. Prior to the opening gavel that officially began the meeting, the Board Chair would introduce the speaker and invite those who wished to stand to do so. After the speaker took the podium, the commissioners (and most audience members) would stand, and the prayer would commence.

While the Board took a hands-off approach to the actual content of the prayers, that content is relevant here. As the district court found and as audio recordings confirm, the prayers frequently contained references to Jesus Christ; indeed, at least half of the prayers offered between January 2006 and February 2007 contained concluding phrases such as "We pray this all in the name under whom is all authority, the Lord Jesus Christ," "[I]t's in Jesus' name that we pray[,]

Amen," and "We thank You, we praise You, and we give Your name glory, and we ask it all in Your Son Jesus' name."

In March 2007, Joyner, Blackmon, and a third plaintiff (who is no longer part of the case) filed a lawsuit seeking declaratory and injunctive relief. Claiming to have attended or watched several Board meetings, the plaintiffs alleged that the Board, "through both its actions and inactions, is sponsoring sectarian opening prayers at [its] meetings." They requested a judgment declaring that the Board's sponsorship of sectarian prayers violated the Establishment Clause along with an injunction preventing future sectarian prayers.

After that lawsuit was filed, the Board decided to formalize its legislative prayer policy. The text of the policy codified past practice, with a few minor variations. Under the written policy, the invocation would no longer be "listed or recognized as an agenda item for the meeting so that it may be clear the prayer is not considered a part of the public business." The policy also stated that nobody "shall be required to participate in any prayer that is offered," and that "[n]either the Board nor the Clerk shall engage in any prior inquiry, review of, or involvement in, the content of any prayer to be offered by an invocational speaker." Finally, the Board clarified that the prayers were "not intended, and shall not be implemented or construed in any way, to affiliate the Board with, nor express the Board's preference for, any faith or religious denomination." Instead, the stated goal of the policy was to "acknowledge and express the Board's respect for the diversity of religious denominations and faiths represented and practiced among the citizens of Forsyth County."

Despite that language, the prayers repeatedly continued to reference specific tenets of Christianity. These were not isolated occurrences: between May 29, 2007 and December 15, 2008, almost four-fifths of the prayers referred to "Jesus," "Jesus Christ," "Christ," or "Savior." In particular, most of the prayers closed by mentioning Jesus, using such phrases as

"This we pray, in the gracious name of the Lord Jesus Christ," "[I]n Jesus' name we pray," and "In the name of Jesus Christ, our Savior." None of the prayers mentioned non-Christian deities.

One of those prayers is particularly salient to this lawsuit. On December 17, 2007, Joyner and Blackmon decided to attend the Board meeting hoping to observe the proceedings — and in Joyner's case, to hear the Board's discussion of an agenda item and to comment during the public participation period. As always, the meeting began with an invocation, this time by a pastor from Winston-Salem. According to Blackmon and Joyner, the Chair of the Board asked the audience to stand for the prayer. At that point, the commissioners and most of the audience stood and bowed their heads.

Before beginning the prayer, the pastor offered the following salutation to the board:

> Before we pray, I would like to say my appreciation to the ones that serve here on the Board. I'm a lifelong resident of Forsyth County, grew up in Lewisville, lived in Winston-Salem, and for the last two years, I lived in Kernersville, and I appreciate your service to me and also the stand the Board took as a whole allowing me, a minister of the Gospel of the Lord Jesus Christ, to be able to pray as the New Testament instructs. And I appreciate that.

The pastor then continued with the prayer itself:

> May we pray. Heavenly Father, tonight we are so grateful for the privilege to pray that is made possible by Your Son and his intercessory work on the Cross of Calvary. And Lord, we think about even a week from tomorrow, Lord, we'll remember that Virgin Birth, and how He was born to die. And

> we're so grateful tonight that we can look in the
> Bible and see how You instituted government.

The pastor then discussed the influence of religion in world affairs, sought divine guidance for the Board, and closed with the salutation, "For we do make this prayer in Your Son Jesus' name, Amen."

On Joyner and Blackmon's account, the overall atmosphere made them feel distinctly unwelcome and "coerced by [their] government into endorsing a Christian prayer." Blackmon claimed that she felt compelled to stand and bow her head because of the Chair's instruction to stand and because of the audience's response. Joyner offered a similar account, believing that if she had failed to comply, it would have "negatively prejudice[d] consideration of [her] intended petition as a citizen appearing for public comment." Both characterized the prayer as sectarian, with Blackmon referring to it as including a "one-minute sermon."

In response, Joyner and Blackmon amended their lawsuit. Their new complaint requested similar relief to its predecessor: a declaratory judgment that the Board's "allowance and sponsorship of sectarian prayers" at its meetings violates the Constitution, and an injunction preventing the Board from "knowingly, intentionally or negligently allowing sectarian prayers . . . before, during or after" the meetings. The complaint contained new factual allegations, as well: that the December 17, 2007 prayer was "distinctly sectarian," that the new policy had "ensure[d] that prayer-givers . . . are permitted to give a sectarian prayer," and that the policy had actually increased the percentage of sectarian prayers from half to just under four-fifths of all prayers.

After both parties filed motions for summary judgment, the magistrate judge concluded that the plaintiffs should prevail. The court began by noting that both Supreme Court and Fourth Circuit precedent prevent the government from

exploiting prayer opportunities to affiliate the government with a specific faith. And it acknowledged that the "Defendant's policy does many things right," such as "striv[ing] to include a wide variety of speakers from diverse religious faiths." But looking at the factual record, the magistrate judge concluded that the prayers themselves pushed the policy across the constitutional line. In the magistrate's view, the prayers occurring after the policy's enactment "display[ed] a preference for Christianity over other religions by the government" and "affiliate[d] the Board with a specific faith or belief," meaning that the prayers could not "be considered non-sectarian or civil prayer."

In a brief order, the district court adopted the magistrate's recommendation. It conducted a de novo review of the factual record and agreed that the policy "has resulted in Government-sponsored prayers that advance a specific faith or belief and have the effect of affiliating the Government with that particular faith or belief." Accordingly, the district court issued a declaratory judgment that the "invocation Policy, as implemented, violates the Establishment Clause of the Constitution" and an injunction against the Board "continuing the Policy as it is now implemented." This appeal followed.

## II.

At its core, this is not a case about the Establishment Clause in general, but about legislative prayer in particular. This distinction is critical, for legislative prayer lies at the heart of two intersecting realities.

## A.

On the one hand, it is a historical fact that legislative prayer "is deeply embedded in the history and tradition of this country." *Marsh v. Chambers*, 463 U.S. 783, 786 (1983). Indeed, "[f]rom colonial times through the founding of the Republic and ever since, the practice of legislative prayer has coexisted

with the principles of disestablishment and religious freedom." *Id.*; *see also Cnty. of Allegheny v. ACLU*, 492 U.S. 573, 603 (1989) (recognizing the unique history of legislative prayer). Taking heed of this basic reality, the Supreme Court has acknowledged the legitimacy of legislative prayer on multiple occasions.

For example, in *Marsh*, the Court confronted the constitutionality of the Nebraska Legislature's decision to have a paid chaplain offer a brief prayer before each legislative session. *See Marsh*, 463 U.S. at 784-85. The Court engaged in a lengthy historical analysis, noting that "the men who wrote the First Amendment Religion Clauses did not view paid legislative chaplains and opening prayers as a violation of that Amendment, for the practice of opening sessions with prayer has continued without interruption ever since that early session of Congress." *Id.* at 788. The practice of legislative prayer was similarly commonplace in the states. *See id.* at 788-89. Based on that history, the Court concluded that there was "no real threat to the Establishment Clause arising from a practice of prayer similar to that now challenged." *Id.* at 791.

While *Marsh* is the only Supreme Court case to address directly the constitutionality of legislative prayer, the Court has since reaffirmed its support for the practice while ruling on the propriety of two allegedly unconstitutional holiday displays located on public property in Pittsburgh. *See Allegheny*, 492 U.S. 573. Though the Court ruled that one of those displays was unconstitutional, it was careful to reaffirm the status of legislative prayer as one of our "accepted traditions dating back to the Founding." *Id.* at 602 (quotation and citation omitted).

We have followed the Supreme Court's guidance in repeatedly upholding the practice of legislative prayer. In *Wynne v. Town of Great Falls*, 376 F.3d 292 (4th Cir. 2004), we considered the legislative prayer policy employed by the Town

Council of Great Falls, South Carolina. In so doing, we observed that "[p]ublic officials' brief invocations of the Almighty before engaging in public business have always, as the *Marsh* Court so carefully explained, been part of our Nation's history." *Wynne*, 376 F.3d at 302. And while we determined that the town council's policy was unconstitutional as implemented, that decision was by no means based on a wholesale condemnation of legislative prayer. To the contrary, we made quite clear that invocations were still permissible. *See id.* ("The Town Council of Great Falls remains free to engage in . . . invocations prior to Council meetings.")

We drove this point home in *Simpson v. Chesterfield County Board of Supervisors*, 404 F.3d 276 (4th Cir. 2005), taking care to explain the numerous salutary benefits of invocations. In *Simpson*, a citizen challenged the Chesterfield County Board of Supervisors' invocation practice, which afforded religious leaders throughout the county an opportunity to give a "non-sectarian" prayer at the start of board meetings on a first-come, first-serve basis. *Simpson*, 404 F.3d at 278-79. We rejected her challenge. Harkening back to *Marsh*, we observed that "legislative invocations perform the venerable function of seeking divine guidance for the legislature" and "constitute 'a tolerable acknowledgment of beliefs widely held among the people of this country.'" *Id.* at 282 (quoting *Marsh*, 463 U.S. at 792). *See also Turner v. City Council of the City of Fredericksburg*, 534 F.3d 352, 356 (4th Cir. 2008) ("The Council's decision to open its legislative meetings with nondenominational prayers does not violate the Establishment Clause.").

In sum, invocations at the start of legislative sessions can solemnize those occasions; encourage participants to act on their noblest instincts; and foster the humility that recognition of a higher hand in human affairs can bring. There is a clear line of precedent not only upholding the practice of legislative prayer, but acknowledging the ways in which it can bring

together citizens of all backgrounds and encourage them to participate in the workings of their government.

B.

At the same time, both the Supreme Court and this circuit have been careful to place clear boundaries on invocations. That is because prayer in governmental settings carries risks. The proximity of prayer to official government business can create an environment in which the government prefers — or appears to prefer — particular sects or creeds at the expense of others. Such preferences violate "[t]he clearest command of the Establishment Clause": that "one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). After all, "[w]hatever else the Establishment Clause may mean . . . it certainly means at the very least that government may not demonstrate a preference for one particular sect or creed." *Allegheny*, 492 U.S. at 605. More broadly, while legislative prayer has the capacity to solemnize the weighty task of governance and encourage ecumenism among its participants, it also has the potential to generate sectarian strife. Such conflict rends communities and does violence to the pluralistic and inclusive values that are a defining feature of American public life.

The cases thus seek to minimize these risks by requiring legislative prayers to embrace a non-sectarian ideal. That ideal is simply this: that those of different creeds are in the end kindred spirits, united by a respect paid higher providence and by a belief in the importance of religious faith. Yet an ideal so much in evidence in our coinage, in the Pledge of Allegiance, in our own "God save the United States and this Honorable Court"—an ideal long thought to be both meaningful and unifying—now strikes the dissent as unacceptably bland. For the dissent astonishingly disparages this ideal, dismissing non-sectarian invocations as mere "civil nicet[ies]" that treat prayer "agnostically." *Post* at 28. This view not only

diminishes meaningful observances offered every day across this country. It denies to invocations their inclusive aspect.

It was, in fact, this inclusive aspect that the Supreme Court took care to emphasize. In *Marsh*, for example, the Court noted that one of the reasons that the founders had no objection to legislative prayer was that the invocations commonplace at the time represented "conduct whose . . . effect . . . harmonize[d] with the tenets of some or all religions." *Marsh*, 463 U.S. at 792 (quoting *McGowan v. Maryland*, 366 U.S. 420, 442 (1961)). Nebraska's invocations fell within that tradition, going so far as to remove "all references to Christ after a 1980 complaint from a Jewish legislator," *id.* at 793 n.14, in order to ensure that the prayers represented a "tolerable acknowledgement of beliefs widely held among the people of this country," *id.* at 792. These efforts at ecumenism were essential to the Court's holding: it concluded that the prayer policy was constitutional because there was "no indication that [Nebraska's] prayer opportunity ha[d] been exploited to proselytize or advance any one, or to disparage any other, faith or belief." *Id.* at 794-95. Indeed, while the Court noted that "[t]he content of the prayer[s] is not of concern to judges," *id.* at 794, it adopted such a hands-off approach only once it was satisfied that Nebraska's prayers did not "proselytize or advance" a particular creed, *id.*

*Allegheny* underscored the point, clarifying that "[t]he legislative prayers involved in *Marsh* did not violate [the Establishment Clause] *because* the particular chaplain had 'removed all references to Christ.'" *Allegheny*, 492 U.S. at 603 (quoting *Marsh*, 463 U.S. at 793 n.14) (emphasis added). As the Court observed, *Marsh* "recognized that not even the 'unique history' of legislative prayer can justify contemporary legislative prayers that have the effect of affiliating the government with any one specific faith or belief." *Id.* (quoting *Marsh*, 463 U.S. at 791) (citation omitted). Moreover, the Court took pains to distinguish between the constitutionality of "a specifically Christian symbol, like a creche, and more

general religious references, like the legislative prayers in *Marsh*." *Id.*

Our cases have hewed to this approach, approving legislative prayer only when it is nonsectarian in both policy and practice. In *Wynne*, the town council had adopted an allegedly neutral prayer policy but had nevertheless commenced every meeting with opening prayers that expressly and repeatedly referred to Jesus Christ. *See Wynne*, 376 F.3d at 295, 296 n.2. Reading *Marsh* and *Allegheny* to "teach that a legislative body cannot, consistent with the Establishment Clause, 'exploit' this prayer opportunity to 'affiliate' the Government with one specific faith or belief in preference to others," we struck down the policy. *Id.* at 298. The basis for our decision was straightforward: unlike in *Marsh*, where "the chaplain had affirmatively 'removed all references to Christ,'" *id.* (quoting *Marsh*, 463 U.S. at 793 n.14), the prayers in *Wynne* "'frequently' contained references to 'Jesus Christ,' and thus promoted one religion over all others, dividing the Town's citizens along denominational lines," *id.* at 298-99. The prayers thus ran afoul of *Marsh*'s proscription of prayers that "advance any one . . . faith or belief." *Id.* at 300 (quoting *Marsh*, 463 U.S. at 794-95). We found unpersuasive the council's arguments that its references to Jesus Christ fell within "*Marsh*'s approval of a prayer 'in the Judeo-Christian tradition,'" *id.* at 299 (quoting *Marsh*, 463 U.S. at 793), for the prayers referenced Christ — "a deity in whose divinity *only* those of the Christian faith believe," *id.* at 300.

We reaffirmed that basic principle just one year later in *Simpson*. The policy at issue there explicitly required nonsectarian prayers. It mandated that each "invocation must be non-sectarian with elements of the American civil religion and must not be used to proselytize or advance any one faith or belief or to disparage any other faith or belief." *Simpson*, 404 F.3d at 278. We upheld the policy precisely because the prayers were nondenominational. We noted that unlike in *Wynne*, where the "sectarian references in invocations were

far more than occasional or incidental," *id.* at 283, the board in *Simpson* had "aspired to non-sectarianism and requested that invocations refrain from using Christ's name or, for that matter, any denominational appeal," *id.* at 284. Indeed, the board's policy in action had resulted in "a wide variety of prayers" that "described divinity in wide and embracive terms," displaying "ecumenism . . . consonant with our character both as a nation of faith and as a country of free religious exercise and broad religious tolerance." *Id.*; *see also Turner*, 534 F.3d at 356 ("The Council's decision to provide only nonsectarian legislative prayers places it squarely within the range of conduct permitted by *Marsh* and *Simpson*. The restriction that prayers be nonsectarian in nature is designed to make the prayers accessible to people who come from a variety of backgrounds, not to exclude or disparage a particular faith.").

The case law thus sets out clear boundaries. As amicus Baptist Joint Committee for Religious Liberty puts it, "this [c]ourt's legislative prayer decisions have recognized that the exception created by *Marsh* is limited to the sort of nonsectarian legislative prayer that solemnizes the proceedings of legislative bodies without advancing or disparaging a particular faith." Amicus Br. Baptist Joint Comm. for Religious Liberty 13. Put differently, legislative prayer must strive to be nondenominational so long as that is reasonably possible — it should send a signal of welcome rather than exclusion. It should not reject the tenets of other faiths in favor of just one. Infrequent references to specific deities, standing alone, do not suffice to make out a constitutional case. But legislative prayers that go further — prayers in a particular venue that repeatedly suggest the government has put its weight behind a particular faith — transgress the boundaries of the Establishment Clause. Faith is as deeply important as it is deeply personal, and the government should not appear to suggest that some faiths have it wrong and others got it right.

III.

Taken together, the principles set forth by the Supreme Court in *Marsh* and *Allegheny* and by this circuit in *Wynne* and *Simpson* establish that the Board's policy, as implemented, cannot withstand scrutiny. The December 17, 2007 prayer — the prayer that led to the plaintiffs' amended complaint — clearly crossed the constitutional line. In *Wynne*, we concluded that the town council's prayers "clearly 'advance[d]' one faith, Christianity, in preference to others, in a manner decidedly inconsistent with *Marsh*," *Wynne*, 376 F.3d at 301, because they ended with a solitary reference to Jesus Christ. The prayer here went further. It discussed specific tenets of the Christian religion, from the "Cross of Calvary" to the "Virgin Birth" to the "Gospel of the Lord Jesus Christ." The December 17 invocation thus "engage[d], as part of public business and for the citizenry as a whole, in prayers that contain[ed] explicit references to a deity in whose divinity only those of one faith believe." *Wynne*, 376 F.3d at 301.

Nor was the December 17 prayer the exception, rather than the rule, as our friend in dissent suggests. *Post* at 39. December 17 was of course the day Joyner and Blackmon chose to attend a Board meeting and heard the sectarian opening prayer. But the day was hardly unusual. As the magistrate judge found, "[t]he undisputed record shows that the prayers delivered at the outset of Board meetings from May 29, 2007 through December 15, 2008 referred to Jesus, Jesus Christ, Christ, or Savior with overwhelming frequency." Almost four-fifths of the prayers contained such references. The prayers closed — like the prayers in *Wynne* — with invocations to "the gracious name of the Lord Jesus Christ," with references to "the merits of Jesus Christ, Thy Son and our Savior," and with reminders that the prayers were "[i]n the blessed name of Jesus." *See Wynne*, 376 F.3d at 294 (prayers closed with "In Christ's name we pray"). The prayers before the policy likewise featured a substantial number of sectarian references.

Moreover, it is not the case, as the dissent suggests, that the prayers "were largely generic petitions to a Divine Being to bless the legislative body and request that it be guided to act wisely and justly in the interest of the citizens." *Post* at 37. If that were true, this case would be quite different. But here there were many prayers that not only invoked Jesus' name throughout, *see, e.g.*, February 25, 2008 (beginning, "Father . . . we thank you for your son Jesus Christ our redeemer, we thank you for the holy spirit who is our guidance and our counselor"); but also that both before and after the policy invoked specific tenets and articles of faith of Christianity, *see, e.g.*, November 10, 2008 (opening with thanks to God "for the Lord Jesus Christ, the one that loved us and gave himself for us at Calvary"); February 12, 2007 (praying "oh Lord, our Lord, we thank you for your son Jesus who died on Calvary that we might have a life and have it more abundantly"). Taken as a whole, it is clear that the prayers offered under the Board's policy did not "evoke common and inclusive themes and forswear . . . the forbidding character of sectarian invocations." *Simpson*, 404 F.3d at 287. *Wynne* and *Simpson* set forth the constitutional line, and these prayers crossed it.

## IV.

The Board makes a number of arguments in defense of its policy. We shall address them in turn.

### A.

First, the Board argues that we should decline to apply *Wynne* and *Simpson*. In its view, *Wynne* does not control this case because the prayers there were delivered by members of the town council. According to the Board, this factual distinction is dispositive, for while prayers delivered by government officials carry an "obvious and inherent risk" of affiliation, prayers delivered by "a wide pool of volunteer, self-selected citizens" will not show "the government's allegiance to a par-

ticular sect or creed." Appellant's Br. at 22 (quotations and citations omitted). Similarly, the Board argues that *Simpson* is factually distinguishable because the county board there decided to artificially narrow the group of eligible religious leaders to "representatives of Judeo-Christian or monotheistic religions." *Id.* at 23. While safeguards like nonsectarian messages and wide-ranging religious appeals were necessary in the presence of such editorial control, the Board argues that they are not required where, as here, the policy is "even more inclusive and completely unlimited." *Id.* at 23-24.

These arguments miss the forest for the trees. With respect to *Wynne*, the Board is right to observe that the prayers were delivered by members of the town council. *See Wynne*, 376 F.3d at 294. But that fact was not dispositive. It was the governmental setting for the delivery of sectarian prayers that courted constitutional difficulty, not those who actually gave the invocation. *Wynne* rested on two pillars: the Supreme Court's opinion in *Marsh*, which flatly declared that legislative prayer cannot "proselytize or advance any one . . . faith or belief," *id.* at 300 (quoting *Marsh*, 463 U.S. at 794-95), and the Court's subsequent clarification that the prayers in *Marsh* were constitutional "*because* the particular chaplain had removed all references to Christ," *id.* at 299 (quoting *Allegheny*, 492 U.S. at 603). Those principles apply with equal force here. And lest there be any doubt, we applied the same type of analysis in *Wynne* to the policy in *Simpson*, *see Simpson*, 404 F.3d at 283-84, which featured prayers delivered by local clergy on a first-come, first-serve basis, *see id.* at 279.

The Board's arguments regarding *Simpson* are equally unpersuasive. Once again, the important factor was the non-sectarian nature of the prayer, not the identity of the particular speaker. While the Board contends that *Simpson*'s discussion of the non-sectarian nature of the prayers was due to the county board's decision to "specifically *den[y]* the intention to create an open forum for private speakers, and instead maintain[ ] a degree of 'content-control' over what was said

by the guests," Appellant's Br. at 23 (citation omitted), that fact was not central to *Simpson*'s holding in any way. Indeed, we never once mentioned that fact in analyzing whether the prayers met constitutional muster. *See Simpson*, 404 F.3d at 282-84. To the contrary, we applauded Chesterfield County for its "wide variety of prayers" and upheld those prayers *because* Chesterfield "aspired to non-sectarianism and requested that invocations refrain from using Christ's name, or, for that matter, any denominational appeal." *Id.* at 284. While no two cases are exactly alike, the Board has given us no convincing reason to depart from the holdings of *Wynne* and *Simpson*.

B.

Next, the Board argues that the district court misinterpreted *Marsh*, *Wynne*, and *Simpson* in deciding to "parse[ ] the *content* of particular prayers," Reply Br. at 23, and "impose a blanket censor upon prayer content," Appellant's Br. at 27. In its view, "various other courts have all interpreted this Circuit's precedents very differently than the District Court below," and the district court erred in "finding that the inclusion of sectarian references by guest invocation speakers in Forsyth County rendered the Board's neutral invocations policy unconstitutional." *Id.* at 30.

Likewise, the dissent claims that our holding requires "judicial bodies to evaluate and parse particular religious prayers." *Post* at 28. This claim is ironic in view of the fact that the dissent engages in what can only be described as an extensive evaluative exercise designed to prove — against all evidence in the record — that the prayers in question were of a generic or nonsectarian character. We do not fault the dissent for undertaking its review, but only for attempting to decry that in which it is fully engaged. *See post* at 37-38.

It is true that *Marsh* stated that courts should not "parse the content of a particular prayer." *Marsh*, 463 U.S. at 795. This

makes perfect sense. As a practical matter, courts should not be in the business of policing prayers for the occasional sectarian reference — that carries things too far. But the dissent gives the impression that virtually any review by the majority of the invocations under challenge would constitute impermissible "parsing." Quite simply, this stark approach leaves the court without the ability to decide the case, by barring any substantive consideration of the very practice under challenge. It is to say the least an odd view of the judicial function that denies courts the right to review the practice at issue. For to exercise no review at all — to shut our eyes to patterns of sectarian prayer in public forums — is to surrender the essence of the Establishment Clause and allow government to throw its weight behind a particular faith. *Marsh* did not countenance any such idea.

In fact, the *Marsh* Court only endorsed such a hands-off approach in situations where "there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief." *Id.* at 794-95. In other words, courts need to assure themselves that legislative prayer opportunities are not being exploited before they abdicate all constitutional scrutiny. The district and magistrate judges did just that by following precedent and making the determination that *Marsh* and this Circuit's own decisions require.

That is precisely the approach we applied in *Wynne*. Rather than "parsing" the details of a particular prayer, we looked at the district court's factual findings about the frequency with which the council "invoked 'Jesus,' 'Jesus Christ,' 'Christ,' or 'Savior'" in determining whether the prayers actually did proselytize or advance a particular sect. *Wynne*, 376 F.3d at 298 n.4. We took the same approach in *Simpson* as well, taking note of the "wide variety of prayers" and their "nonsectarian[ ]" nature. *Simpson*, 404 F.3d at 284. The district court here followed suit, relying on the magistrate's findings about the "overwhelming frequency" of references to "Jesus,

Jesus Christ, Christ, or Savior" in determining that the prayers did advance one particular faith.

Other circuits have adopted a similar perspective. For example, in *Hinrichs v. Bosma*, 440 F.3d 393 (7th Cir. 2006), the Seventh Circuit declined to stay the district court's ruling that the Indiana House of Representatives' legislative prayer policy was unconstitutional. *See Hinrichs*, 440 F.3d at 395. Like the Forsyth County Board, the Indiana House invited clergy from all over the state to issue a prayer before each legislative session and encouraged the clerics to "strive for an ecumenical prayer." *Id.* Nevertheless, many of the prayers featured "supplications to Christ": they were "given 'in Christ's name,' 'through [Y]our Son Jesus Christ,' [and] 'In the Strong name of Jesus our Savior.'" *Id.* In concluding that a stay would be improper, the Seventh Circuit observed that the cases squarely confronting the constitutionality of "sectarian legislative prayer . . . have concluded that *Marsh* prohibits the practice." *Id.* at 399.* It also noted, as we do, that the Supreme Court's opinion in *Allegheny* "read *Marsh* as precluding sectarian prayer." *Id.*; *see also Snyder v. Murray City Corp.*, 159 F.3d 1227, 1234 (10th Cir. 1998) ("Thus, the kind of legislative prayer that will run afoul of the Constitution is one that proselytizes a particular religious tenet or belief, or that aggressively advocates a specific religious creed, or that derogates another religious faith or doctrine.").

The Board, however, suggests that the Eleventh Circuit's opinion in *Pelphrey v. Cobb County*, 547 F.3d 1263 (11th Cir. 2008) compels a different result. In *Pelphrey*, the court upheld a legislative prayer policy adopted by two county commissions that allowed "volunteer leaders of different religions, on a rotating basis, to offer invocations with a variety of religious expressions." *Pelphrey*, 547 F.3d at 1266. While the majority

---

*In a later opinion, the court concluded that the appellants lacked standing. *See Hinrichs v. Speaker of the House of Representatives of the Ind. Gen. Assembly*, 506 F.3d 584, 585 (7th Cir. 2007).

of prayer-givers were Christian, leaders of all faiths had come forth. *See id.* at 1277. The prayers themselves, in turn, had at times included "ordinarily . . . brief" sectarian terms, such as "references to 'Jesus,' 'Allah,' 'God of Abraham, Isaac, and Jacob,' 'Mohammed,' and 'Heavenly Father.'" *Id.* at 1266. Based on these facts, the Eleventh Circuit concluded that there was no need to "evaluate the content of the prayers" because "the prayers of the County Commission were not exploited to advance one faith or belief." *Id.* at 1278. The Board argues that we should affirm its policy by analogy to *Pelphrey*, drawing from a sentence in the opinion stating that "*Allegheny* does not require that legislative prayer conform to the model in *Marsh*." Appellant's Br. at 29 (quoting *Pelphrey*, 547 F.3d at 1271-72).

But *Pelphrey*'s ruling does not provide the support the Board claims. In upholding the policy in *Pelphrey*, the Eleventh Circuit principally relied on the fact that "the prayers, taken as a whole, did not advance any particular faith." *Pelphrey*, 547 F.3d at 1278. In other words, the *Pelphrey* court adopted the same approach we did in *Wynne* and *Simpson*: it determined as a threshold matter whether the invocations exploited the opportunity for legislative prayer. Indeed, the Eleventh Circuit made this point itself, observing that the "Fourth Circuit read[s] *Marsh*[ ] as we do." *Id.* at 1273. It further noted that *Wynne* and *Simpson* had likewise focused their analysis on the threshold inquiry of whether or not the prayer opportunity had "been exploited to proselytize or advance" a particular faith. *Id.* at 1273 (quoting *Marsh*, 463 U.S. at 794-95).

Such advancement did not take place in *Pelphrey*, where the "diverse references in the prayers, viewed cumulatively, did not advance a single faith." *Id.* at 1277. But just such an advancement has taken place here. This policy was not, as the dissent would have it, "a pluralistic celebration of prayer," *post* at 48, but an advancement of one religion. In practice, the Board's policy resulted in a greater proliferation of sectarian

prayer. Almost four-fifths of the prayers delivered after the adoption of the policy referenced Jesus Christ. None of the prayers mentioned any other deity. And at no time after the adoption of the policy did a non-Christian religious leader come forth to give a prayer. The record thus reflects that the prayers here, taken as a whole, "advance[d one] single faith" to the exclusion of all others. *Pelphrey*, 547 F.3d at 1277.

C.

Finally, the Board argues that its policy should pass muster because it is a neutral policy under which "all views and philosophies are equally welcomed." Appellant's Br. at 26. In its estimation, it is "difficult, if not impossible, to conceive of a more fair, neutral or inclusive invocation policy." *Id.* at 27. In the Board's view, the sectarian nature of the prayer here is simply a function of the "religious demographics of the communities" in Forsyth County. Reply Br. at 24. Because the Board "showed no favoritism or preference at any time between religious faiths," its policy must be upheld. Appellant's Br. at 27.

The Board is correct to observe that its policy is neutral. On its face, the policy states that it is "not intended, and shall not be implemented or construed in any way, to affiliate the Board with, nor express the Board's preference for, any faith or religious denomination." And we agree with the magistrate judge that the policy "does many things right," such as "striv-[ing] to include a wide variety of speakers from diverse religious faiths" and encouraging potential prayer leaders not to disparage other faiths.

But the policy, as implemented, is an altogether different matter. It is not enough to contend, as the dissent does, that the policy was "neutral and proactively inclusive," *post* at 41, when the County was not in any way proactive in discouraging sectarian prayer in public settings. Unlike in *Simpson*, the Board's policy did not require that invocations be "non-

sectarian" and avoid "advanc[ing] any one faith or belief." *Simpson*, 404 F.3d at 278. Moreover, while the Board's policy itself states that it is "not intended . . . to affiliate the Board with, nor express the Board's preference for, any faith or religious denomination," the letter it sends to the religious leaders actually giving the prayers sends a different message. The letter merely instructs them that the prayer opportunity should "not be exploited as an effort to convert others to the particular faith of the invocational speaker, nor to disparage any faith or belief different than that of the invocational speaker." In other words, the letter focuses on only one part of the *Marsh* test — proselytizing — and contains virtually no language discouraging leaders from advancing their own faith. *See Wynne*, 376 F.3d at 300 ("'[P]roselytize' and 'advance' have different meanings and denote different activities.").

On a broader level, and more importantly, citizens attending Board meetings hear the prayers, not the policy. What this means is that we cannot turn a blind eye to the practical effects of the invocations at issue here. The dissent suggests that the "frequency of Christian prayer" was merely the "product of demographics," *post* at 42, and the County "could not control whether the population was religious," *id.* What the dissent offers as a defense of the policy, however, is one of the problems with it. Take-all-comers policies that do not discourage sectarian prayer will inevitably favor the majoritarian faith in the community at the expense of religious minorities living therein. This effect creates real burdens on citizens — particularly those who attend meetings only sporadically — for they will have to listen to someone professing religious beliefs that they do not themselves hold as a condition of attendance and participation. "To . . . Jewish, Muslim, Bahá'i, Hindu, or Buddhist citizens[, ]a request to recognize the supremacy of Jesus Christ and to participate in a civic function sanctified in his name is a wrenching burden." *See* Amicus Br. of American Jewish Congress et al. 8. Such burdens run counter to the essential promise of the Establishment Clause. *See Larson*, 456 U.S. at 244.

This is not to say that the Board must abandon the practice of legislative prayer. Nor do we wish to set forth some sort of template for an ideal legislative prayer policy. After all, as we recognized in *Simpson*, "too much judicial fine-tuning of legislative prayer policies risks unwarranted interference in the internal operations of a coordinate branch." *Simpson*, 404 F.3d at 286-87. The bar for Forsyth County is hardly a high one. Public institutions throughout this country manage to regularly commence proceedings with invocations that provide all the salutary benefits of legislative prayer without the divisive drawbacks of sectarianism. *See id.* at 287 (describing how Chesterfield County's invocations sought "guidance that is not the property of any sect"). And religious leaders throughout this country have offered moving prayers on multitudinous occasions that have managed not to hurt the adherents of different faiths. In the end, the constitutional standard asks of the County no more than what numerous public and governmental entities already meet. Indeed, some of the prayers offered in this very case — albeit a minority — plainly met it.

As it stands now, however, the Board's policy falls short. It resulted in sectarian invocations meeting after meeting that advanced Christianity and that made at least two citizens feel uncomfortable, unwelcome, and unwilling to participate in the public affairs of Forsyth County. To be sure, citizens in a robust democracy should expect to hear all manner of things that they do not like. But the First Amendment teaches that religious faith stands on a different footing from other forms of speech and observance. Because religious belief is so intimate and so central to our being, government advancement and effective endorsement of one faith carries a particular sting for citizens who hold devoutly to another. This is precisely the opposite of what legislative invocations should bring about. In other words, whatever the Board's intentions, its policy, as implemented, has led to exactly the kind of "divisiveness the Establishment Clause seeks rightly to avoid." *Id.* at 284.

At no place does the dissent appreciate the impact of its view upon adherents of minority faiths who hear public meetings open with invocations given in the name of a faith to which they do not subscribe. By accusing the majority of "bowing . . . to universal inoffensiveness," *post* at 49, the dissent appears to dismiss Joyner's and Blackmon's sensitivities as essentially of no moment. This is not right. While it is true that plaintiffs were not coerced, they claim pressure to stand and bow their heads along with the rest or risk having their civic participation correspondingly devalued. And these plaintiffs are not so different from other citizens who may feel in some way marginalized on account of their religious beliefs and who decline to risk the further ostracism that may ensue from bringing their case to court or who simply lack the resources to do so. While the dissent insists that "[t]he Establishment Clause does not protect against feelings of ostracism or marginalization," *id.* at 39, it surely is solicitous of harms visited upon citizens by government's advancement of a particular faith. We may not know what subtle or not-so-subtle pressures non-Christian citizens of the County felt to participate in the sectarian exercise. We do know, however, that citizens should come to public meetings confident in the assurance that government plays no favorites in matters of faith but welcomes the participation of all.

## V.

George Washington once observed that "[r]eligious controversies are always productive of more acrimony and irreconcilable hatreds than those which spring from any other cause." Letter from George Washington to Edward Newenham (June 22, 1792). As our nation becomes more diverse, so also will our faiths. To plant sectarian prayers at the heart of local government is a prescription for religious discord. In churches, homes, and private settings beyond number, citizens practice diverse faiths that lift and nurture both personal and civic life. But in their public pursuits, Americans respect the manifold beliefs of fellow citizens by abjuring sectarianism and

embracing more inclusive themes. That the Board and religious leaders in Forsyth County hold steadfast to their faith is certainly no cause for condemnation. But where prayer in public fora is concerned, the deep beliefs of the speaker afford only more reason to respect the profound convictions of the listener. Free religious exercise posits broad religious tolerance. The policy here, as implemented, upsets the careful balance the First Amendment seeks to bring about.

The judgment of the district court is hereby

*AFFIRMED*.

NIEMEYER, Circuit Judge, dissenting:

When offering legislative prayers in which the Divine Being is publicly asked for guidance and a blessing of the legislators, religious leaders will hereafter have to refrain from referencing the Divine Being with the inspired or revealed name, according to each leader's religion. The majority's decree commands that every legislative prayer reference only "God" or some "nonsectarian ideal," supposedly because other appellations might offend. Thus, in a stated sensitivity to references that might identify the religion practiced by the religious leader, the majority has dared to step in and regulate the language of prayer—the sacred dialogue between humankind and God. Such a decision treats prayer agnostically; reduces it to civil nicety; hardly accommodates the Supreme Court's jurisprudence in *Marsh v. Chambers*, 463 U.S. 783 (1983); and creates a circuit split, *see Pelphrey v. Cobb County, Ga.*, 547 F.3d 1263 (11th Cir. 2008) (finding constitutional legislative prayers offered by "volunteer leaders of different religions, on a rotating basis," even though the prayers referenced Jesus; Allah; the God of Abraham, Isaac, and Jacob; Mohammed; and Heavenly Father). Most frightfully, it will require secular legislative and judicial bodies to evaluate and parse particular religious prayers under an array of criteria identified by the majority.

It is the policy of the Board of Commissioners of Forsyth County, North Carolina, to invite religious leaders from the various congregations in the County, "on a first-come, first-serve basis," to offer a prayer before the beginning of its twice-monthly meetings, "for the benefit and blessing of the Board." The Board allows the religious leaders to determine the content of the prayer except that it "requests only that the prayer opportunity not be exploited as an effort to convert others to the particular faith of the invocational speaker, nor to disparage any faith or belief different than that of the invocational speaker." Under this denominationally neutral and proactively inclusive policy, prayers from a broad array of religions and denominations have been offered, although most —reflecting the County's demographics and the responses of its religious leaders—have been offered by leaders of Christian denominations.

Janet Joyner and Constance Blackmon commenced this action to declare these prayers unconstitutional and to enjoin their continuation because the prayers offered have been mostly Christian and have often invoked the name of Jesus. Joyner and Blackmon allege in their complaint that they are "offended by the sectarian prayers because the prayers are an unconstitutional endorsement of a particular religion and an improper attempt by the county government to prefer one religious faith over others."

The district court granted summary judgment to Joyner and Blackmon, concluding that, because of the frequency of Christian prayers, "the invocation Policy, as implemented, has resulted in Government-sponsored prayers that have advance[d] a specific faith or belief and have the effect of affiliating the government with that particular faith or belief," *i.e.*, Christianity.

I would reverse this judgment. Because Forsyth County has established a completely neutral policy of allowing all and any religious leaders to deliver invocational prayers of their

own composition before Board meetings and has sought proactively to be inclusive, I would conclude that the prayers do not violate the Establishment Clause. The Establishment Clause does not require the County to forbid invocational speakers from making sectarian references in their prayers. Rather, the County's policy of pluralistic inclusion complies with the Establishment Clause and more particularly the Supreme Court's opinion in *Marsh*, which approved legislative prayers as constitutional so long as the government does not proselytize, advance one religion or faith over another, or disparage any other religion or faith. *Marsh*, 463 U.S. at 794-95.

I

The Forsyth County Board of Commissioners has allowed religious invocations before its meetings since 1979, and in May 2007, it adopted a written policy that codified, but did not change, its practice.

The policy expresses the Board's desire "to solemnize [Board] proceedings" but provides that "[n]o member or employee of the Board or any other person in attendance at the meeting shall be required to participate in any prayer that is offered." The policy states that "[t]he prayer shall be voluntarily delivered by an eligible member of the clergy/religious leader in Forsyth County," and, "[t]o ensure that such person (the "invocational speaker") is selected from among a wide pool of the County's clergy/religious leaders," the Clerk of the Board sends an invitation to the religious leader of every congregation with a presence in the County, asking if the religious leader would like to deliver an invocational prayer at a Board meeting. The invitation reads in relevant part:

> The Forsyth County Board of Commissioners makes it a policy to invite members of the clergy/religious leaders in Forsyth County to voluntarily offer a

> prayer before the beginning of its meetings, for the benefit and blessing of the Board.
>
> * * *
>
> This opportunity is voluntary, and you are free to offer the invocation according to the dictates of your own conscience. To maintain a spirit of respect and ecumenism, the Board requests only that the prayer opportunity not be exploited as an effort to convert others to the particular faith of the invocational speaker, nor to disparage any faith or belief different than that of the invocational speaker.

Religious leaders responding to the invitation are scheduled "on a first-come, first-serve basis" to deliver the prayer, and no religious leader receives compensation for the service. Moreover, the Board has charged the Clerk of the Board with making every reasonable effort "to ensure that a variety of eligible invocational speakers are scheduled for the Board meetings." To this end, the policy provides that "[i]n any event, no invocational speaker shall be scheduled to offer a prayer at consecutive meetings of the Board, or at more than two (2) Board meetings in any calendar year."

The policy states that the Board will exercise no editorial control over invocational prayers and that "[n]either the Board nor the Clerk shall engage in any prior inquiry, review of, or involvement in, the content of any prayer to be offered by an invocational speaker."

The list that the Clerk compiled of religious leaders responding to the Clerk's invitation is lengthy and includes a broad array of religions and denominations. While the majority on the list are identifiably Christian, including large Christian denominations, such as Methodists, Baptists, Presbyterians, Greek Orthodox, Catholics, Episcopalians, and Lutherans, it also includes other smaller Christian denomina-

tions and non-Christian religions, such as Moravian, "non-denominational," Universalist, Deliverance, Apostolic, Disciples of Christ, Church of Christ, Ba'hai Faith, Holiness, Wesleyan, Interdenominational, Islamic, Jewish, Mormon, Seventh Day Adventist, Assembly of God, Nazarene, Pentecostal, Friends/Quaker, and Jehovah's Witness.

The prayers that have been offered by the responding religious leaders have generally asked for Divine guidance and the blessing of the Board, usually appealing to "God" or "Father." A number of the Christian prayers also ended by invoking the name of Jesus.

The American Civil Liberties Union of North Carolina Legal Foundation ("ACLU") wrote a letter to the Board in October 2006 "recommend[ing] that [the Board] adopt a policy to ensure that Forsyth County Board of Commissioners meetings are not being opened with sectarian invocations." When the Board, in response to the admonition, affirmed its policy of opening its meetings with invocations by religious leaders under the neutral and inclusive policy that it had followed since 1979, Janet Joyner and Constance Blackmon commenced this action against the Board.

In their complaint, Joyner and Blackmon complain of "at least 16 sectarian (Christian) prayers" delivered at meetings during the course of the year from January 2006 through February 2007, as well as a prayer given on December 17, 2007. Most of the challenged prayers, which are set forth in the complaint, asked God to guide and bless the Commissioners and invoked Jesus' name at the conclusion. Joyner and Blackmon alleged that these sectarian prayers "offended" them because they constituted "an unconstitutional endorsement of a particular religion and an improper attempt by the county government to prefer one religious faith over others."

On cross-motions for summary judgment, the magistrate judge concluded that the prayers presented at the beginning of

meetings of the Board of Commissioners could not, "as a whole," be considered "nonsectarian or civil prayer." The magistrate judge concluded that the prayers displayed "a preference for Christianity over other religions by the government. The frequent references to Jesus Christ cause the prayers to promote one religion over all others, and thus the effect of these prayers is to affiliate the Board with a specific faith or belief." The magistrate judge recommended that Joyner and Blackmon's motion for summary judgment be granted and that Forsyth County's motion for summary judgment be denied.

The district judge agreed and signed an order, dated January 28, 2010, declaring that the invocation policy, "as implemented," violated the Establishment Clause and enjoining the Board from "continuing the Policy as it is now implemented."

The majority affirms this judgment. In doing so, it does not prohibit legislative prayer, nor does it find the policy unconstitutional. Rather, it finds that because the prayers actually offered were predominately Christian, often invoking the name of Jesus, the practice violated the Establishment Clause. It reasoned, "The *proximity* of prayer to official government business can create an environment in which the government prefers—*or appears to prefer*—particular sects or creeds at the expense of others." *Ante*, at 13 (emphasis added). It rules accordingly that the Forsyth County Board of Commissioners cannot tolerate prayers at its meetings that so frequently invoke the name of Jesus. For the reasons that follow, I conclude that the Establishment Clause does not require that Forsyth County censor and restrict legislative prayers as the majority mandates.

II

In their complaint, Joyner and Blackmon focus on actual legislative invocations, not the policy governing the prayers. They note that a vast majority of the prayers given have been

Christian and have often invoked Jesus, and they argue, therefore, that this de facto pattern unconstitutionally advances Christianity over all other faiths.

Forsyth County maintains that its policy for opening legislative sessions with prayer is neutral and inclusive and that the Board has not advanced one faith or religion in implementing the policy. It stresses that the Supreme Court has cautioned courts against parsing legislative prayers, as Joyner and Blackmon would have us do. Because there is no evidence that the County has used its policy to advance one religion over another, it maintains that, under *Marsh*, we must not analyze and judge the content of each prayer.

While Forsyth County does not deny that a majority of the prayers were offered by religious leaders of Christian denominations and that many of the prayers invoked the name of Jesus, it contends that the Establishment Clause does not require a legislative body to censor Jesus' name or other names given by a religion to the Divine Being from invocations when the invocations are offered "before a meeting, in a designated public forum, by a diverse pool of visiting religious leaders who volunteer in response to an open, equal invitation." It asserts that under *Marsh*, it can open sessions with prayer so long as the prayer opportunity has not been exploited to proselytize, to advance any one religion or faith, or to disparage any religion or faith, and that the content of such prayer "is not of concern to judges."

Because the only evidence of the government advancing one religion was the fact that a majority of the prayers offered under the neutral and inclusive policy were Christian, I would find the evidence insufficient to support the conclusion that Forsyth County was advancing Christianity. Accordingly, I would affirm both the policy and the practice under it.

The *Marsh* decision, which stands as the applicable law, *see Simpson v. Chesterfield County Bd. of Supervisors*, 404

F.3d 276, 280-82 (4th Cir. 2005), holds in a straightforward manner that legislative prayer to a Divine Being does not violate the Establishment Clause, which provides that "no law respecting an establishment of religion" be made. U.S. Const. amend. I. Based on a continuous historical practice of over 200 years and the original understanding of the Clause, the Supreme Court in *Marsh* stated:

> We conclude that legislative prayer presents no more potential for establishment than the provision of school transportation, beneficial grants for higher education, or tax exemptions for religious organizations.

*Marsh*, 463 U.S. at 791 (internal citations omitted). Explaining, the Court stated:

> In light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society. To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an "establishment" of religion or a step toward establishment.

*Id.* at 792.

To support his argument in *Marsh* that the Nebraska practice of opening legislative sessions with prayer was inappropriate, legislator Ernest Chambers pointed to the facts (1) "that a clergyman of only one denomination—Presbyterian—has been selected for 16 years"; (2) "that the chaplain is paid at public expense"; and (3) "that the prayers are in the Judeo-Christian tradition." *Marsh*, 463 U.S. at 793. Yet the Supreme Court found each of the three arguments made by legislator Chambers insufficient to render Nebraska's practice unconstitutional. Rejecting Chambers' first point, the Supreme Court

observed that "[w]e cannot, any more than Members of the Congresses of this century, perceive any suggestion that choosing a clergyman of one denomination advances the beliefs of a particular church. To the contrary, the evidence indicates that [the clergyman] was reappointed because his performance and personal qualities were acceptable to the body appointing him." *Id.* at 793. The second point is not applicable here because Forsyth County did not pay the religious leaders. And finally, addressing the complaint that the prayers were in the Judeo-Christian tradition, the Court stated what is applicable here:

> The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief. That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer.

*Id.* at 794-95.

In sum, *Marsh* stands for the following principles of Establishment jurisprudence: (1) legislative prayer invoking Divine guidance for a legislative body is not an establishment of religion, 463 U.S. at 792; (2) choosing the religious leader of a single denomination or religion to say the legislative prayer does not advance the beliefs of that leader's religion over others, *id.* at 793; (3) the fact that prayers are only from the Judeo-Christian tradition is irrelevant, as "it is not for [courts] to embark on a sensitive evaluation or to parse the content of a particular prayer," *id.* at 794-95; and (4) legislative prayers may not proselytize, advance one religion over another, or disparage other religions or beliefs, *id.*

The majority reads *Marsh* as resting on the fact that the challenged prayers in that case were characterized as Judeo-Christian—a "non-sectarian ideal," as the majority claims.

*Ante*, at 13. To support this reading, it points to the Supreme Court's dicta in *County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573 (1989), referring to the general religious references in *Marsh*. *Allegheny*'s dicta, however, do not govern legislative prayer cases. As this court noted, "*Allegheny* concerned religious holiday displays, referencing *Marsh* to confirm that *Marsh* did not apply in that context. Nothing in *Allegheny* suggests that it supplants *Marsh* in the area of legislative prayer." *Simpson*, 404 F.3d at 281 n.3. Using cases in other areas of Establishment Clause jurisprudence is especially dangerous, because "if *Marsh* means anything, it is that the Establishment Clause does not scrutinize legislative invocations with the same rigor that it appraises other religious activities." *Id.* at 287.

In this case, Joyner and Blackmon raise arguments similar to those rejected in *Marsh*, and I would likewise reject them here.

Even as I recognize that the content of prayer remains mostly out of bounds for review by civil courts, I must note, in view of the majority's emphasis on content, that the prayers in this case were largely generic petitions to a Divine Being to bless the legislative body and request that it be guided to act wisely and justly in the interest of the citizens. Indeed, it is remarkable how uniform in this regard the prayers were. Looking at some of the examples included in the complaint, the core requests of these prayers state:

- [S]o we ask tonight, Father, not only for You to be in our midst but for You to make available to each commissioner every resource they will need to be able to make the right decisions. [January 9, 2006]

- We pray tonight, God, that You will guide these commissioners; and we pray, God, that You will strengthen the residents of this community. God,

we pray that You would lead us and we pray that You will forever bless Forsyth County. [February 13, 2006]

- [W]e pray that these men and women in positions of authority, recognizing this, will take their positions seriously; that they will not use them to their own advantage, but the advantage of those they serve; that they would ask Your guidance and wisdom when making decisions; and that they would seek Your approval over the approval of men and women. [March 13, 2006]

- I pray for these commissioners tonight. I pray for all that will transpire in this meeting under Your authority; as the act of governing goes forth, that it would go forth with equity and with justice and with kindness and with wisdom. [March 27, 2006]

- Father, bless the things that are said tonight and the decisions that are made. [April 10, 2006]

- I'd ask that You'd give them great wisdom as they make decisions about our lives here in Forsyth County. [May 8, 2006]

- We ask a special blessing upon our commissioners, Father. We ask that You would grant them with wisdom and understanding. [May 22, 2006]

- [W]e would ask You to give Your spirit to this meeting; and that these commissioners, they may seek justice for all and hear the voices of those in need. [June 26, 2006]

Most of the prayers did conclude with a Christian invocation, such as "in Jesus' name we pray."

The majority focuses on the prayer given on December 17, 2007, noting that it not only contained many references to Jesus Christ, but also references his divine role. This focus by the majority on the December 17 prayer, simply because of its description of Jesus' role in Christianity, is precisely the content-inquiry that *Marsh* intended to foreclose. With such an inquiry, must we now determine how many times the name Jesus is spoken or what description of him is given? Surely because there is no standard for this inquiry, the majority seems to fall back on an evaluation of the "pressure to stand and bow" or on some form of "ostracism" felt by persons hearing the prayer. *Ante*, at 27. Yet in doing so, the majority relies on inappropriate grounds for finding a constitutional violation. The Establishment Clause does not protect against feelings of ostracism or marginalization. *See Lee v. Weisman*, 505 U.S. 577, 597 (1992) ("We do not hold that every state action implicating religion is invalid if one or a few citizens find it offensive. People may take offense at all manner of religious as well as nonreligious messages, but offense alone does not in every case show a violation"). Rather, the Establishment Clause prevents governments from preferring one religion over others. The majority's focus on the December 17 prayer misdirects the necessary analysis.

To be sure, Joyner and Blackmon did, in their amended complaint, also focus on the December 17 prayer. But they did so to complain that any invocation of Jesus by the religious leaders speaking the prayers evidences a governmental preference for Christian prayer. Under their complaint, the only question raised is whether the multiplicity of prayers said in the Christian tradition constitutes a government advancement of prayer, in violation of the Establishment Clause. The majority goes a step further than the plaintiffs' complaint, noting not only the multiplicity of references to Jesus but also the degree of sectarianism contained in particular prayers. This inquiry, distinguishing "hard" sectarianism from more "soft" sectarian references embroils the court in a standardless review of religious prayers.

In determining what it means to "advance" one religion or faith over others, the touchstone of the analysis should be whether *the government* has placed its imprimatur, deliberately or by implication, on any one faith or religion. *See Marsh*, 463 U.S. at 792-94. More is necessary than to find that religious leaders selected to offer prayers were of one denomination. In *Marsh*, even though the Nebraska legislature had placed its imprimatur on the Presbyterian chaplain's prayers inasmuch as the chaplain had been employed and paid by the legislature for 16 years, the Supreme Court concluded that the legislature had not advanced one religion, because the chaplain had given broad, inclusive prayers over those years. *See Marsh*, 463 U.S. at 793 n.14.

By contrast, however, in *Wynne v. Town of Great Falls, South Carolina*, 376 F.3d 292 (4th Cir. 2004), the Town Council allowed only Christian prayers and refused to allow prayers associated with other religions. *Id.* at 295. In that circumstance, we held that the Council's actions had affiliated the Council with one specific faith and demonstrated a preference for Christianity over other religions. *Id.* at 298-99. As we noted,

> Here, the Town Council insisted upon invoking the name "Jesus Christ," to the exclusion of deities associated with any other particular religious faith, at Town Council meetings in public prayers in which the Town's citizens participated. Thus, the Town Council clearly "advance[d]" one faith, Christianity, in preference to others, in a manner decidedly inconsistent with *Marsh*.

*Id.* at 301; *see also Simpson*, 404 F.3d at 282 (characterizing *Wynne* as holding that "a Town Council's practice explicitly advancing exclusively Christian themes to be unconstitutional").

In *Simpson*, we addressed a prayer policy much like the one at issue here and affirmed its constitutionality. Chesterfield

County had established a first-come, first-serve policy for religious leaders to give invocations. But the County did decline to allow a Wiccan to offer an invocational prayer. Even though the governmental entity exercised this limited control, we approved the County's policy, based mostly on the general inclusiveness of its policy and its neutrality generally in selecting leaders to deliver prayers. While the holding in *Simpson* did not explicitly hinge on the fact that religious leaders honored the County's request not to make sectarian references in prayers, that too was an indicator that the government was not using its power to select religious leaders to offer prayers to advance a particular religion. *See* 404 F.3d at 284.

When examining Forsyth County's policy and practice in light of these cases, one can only conclude—indeed, more clearly than in *Marsh* and *Simpson*—that Forsyth County did not exploit the prayer opportunity to advance any one religion over others. Most importantly, nothing demonstrates the County's preference for any particular faith or religion. Indeed, the evidence shows otherwise.

*First*, the County established a neutral and proactively inclusive policy of allowing all religious leaders in the County to deliver invocations at Board meetings. It is undisputed that both the County's policy and its implementation treat religious leaders from all religions *identically*, and no congregation was excluded from the County list. Indeed, the County proactively protected its inclusive policy by (1) inviting religious leaders from *all* congregations in the County to offer prayers; (2) allowing any congregation that was accidentally excluded from the list to be placed on the list simply by making a written request to the Clerk; and (3) insisting that no religious leader could offer a prayer in back-to-back meetings and, in any event, no more than two times a year.

*Second*, the Clerk scheduled the invocations on a first-come, first-serve basis, eliminating any opportunity for County officials to assert preferences.

*Third*, the County exercised no editorial control over the invocations beyond that required by *Marsh*. It did not even request to review prayers before religious leaders offered them.

And *fourth*, the County stated affirmatively to each religious leader that the prayer opportunity must not be "exploited as an effort to convert others to the particular faith of the invocational speaker, nor to disparage any faith or belief different than that of the invocational speaker."

None of the policies in the prior cases approving legislative prayer was as neutral and inclusive as the policy in Forsyth County, and there is no evidence that Forsyth County diverged from its policy in implementing it.

Joyner and Blackmon argue that Forsyth County has effectively advanced Christianity over other religions, even though the County's policy was neutral and inclusive, because it turned out that most of the prayers offered were in fact Christian prayers. But this argument fails to recognize that the nature of the prayer was not determined by the County or by any policy the County adopted or implemented. The frequency of Christian prayers was not the wish or preference of Forsyth County, and the County in no way affirmed one faith over another. The frequency of Christian prayer was, rather, the product of demographics and the choices of the religious leaders who responded out of their own initiative to the County's invitation. The County provided the most inclusive policy possible, but it could not control whether the population was religious and which denominations' religious leaders chose to accept the County's invitation to offer prayer. Moreover, there is no evidence to suggest that the Board attempted to game the demographics of Forsyth County by manipulating the list of religious leaders to ensure that only Christian prayer would be offered. The Board never even informed itself of the religious demographics of the County. Thus, sectarian references were the product of free choice and religious leaders' com-

posing their own invocations, without any control or review of content by the County.

This record does not support the conclusion that Forsyth County established religion or expressed a preference for or an affiliation with any particular religion any more than the record did in the school voucher cases. *See Zelman v. Simmons-Harris*, 536 U.S. 639 (2002). In *Zelman*, the Supreme Court upheld a school voucher program against an Establishment Clause challenge, stating that "where a government aid program is neutral with respect to religion, and provides assistance directly to a broad class of citizens who, in turn, direct government aid to religious schools wholly as a result of their own genuine and independent private choice, the program is not readily subject to challenge under the Establishment Clause." *Id.* at 652; *see also Good News Club v. Milford Central Sch.*, 533 U.S. 98, 114 (2001) ("[A] significant factor in upholding governmental programs in the face of Establishment Clause attack is their *neutrality* towards religion"). In the same way, Forsyth County does not advance one religion. It allows *all* religions to give legislative invocations and cautions those religious leaders not to exploit the opportunity for proselytization or disparagement.

The majority somehow concludes that because religious leaders offered sectarian prayers, Forsyth County's policy and implementation of its policy were for that reason not neutral. It states, "Sectarian prayers must not serve as the gateway to citizen participation in the affairs of local government. To have them do so runs afoul of the promise of public neutrality among faiths that resides" in the Constitution. *Ante*, at 5. This argument actually backfires, though, requiring the County to police prayers, rather than to remain neutral. It also overlooks the real life fact that when Forsyth County calls for prayers from religious leaders under a neutral policy that is proactively inclusive, the prayers will reflect the religions of the religious leaders, not the preferences of the County.

The majority holds the position that "to shut our eyes to *patterns* of sectarian prayer in public forums is to surrender the essence of the Establishment Clause." *Ante*, at 21 (emphasis added). Yet it also recognizes that "courts should not be in the business of policing prayers for the *occasional* sectarian reference—that carries things too far." *Id.* (emphasis added). Yet its holding, focusing on the prayer of December 17, polices all prayer to exclude sectarian references. To be fair, the majority is probably more troubled with the frequency of Christian references than with the December 17 prayer. It complains that the references to Jesus were overwhelming, *ante*, at 21-22, representing "almost four-fifths of the prayers," *ante*, at 24. This general content review, however, is also problematic and can lead to religious hostility. The court is left with either directing the government to prohibit sectarian prayer altogether, a position that is not constitutionally required and is in direct conflict with *Pelphrey v. Cobb County, Ga.*, 547 F.3d 1263 (11th Cir. 2008), or requiring legislative bodies to establishment sectarian quotas.

The majority's position also entangles the legislative bodies in determining what form of prayer is sectarian or offensive to given members of the public. For example, adherents to the Hindu or Muslim religions could assert that they are offended by prayers in the Judeo-Christian tradition, which the majority has deemed to be nonsectarian and nonoffensive. But Forsyth County has appropriately remained neutral to these concerns, welcoming prayers from *all* religious congregations in the County.

Joyner and Blackmon's proposed alternative of requiring a policy that mandates only nonsectarian prayer, which is now adopted by the majority, is problematic and not constitutionally required. Not only would it risk governmental intrusion into the practice of exercising religious beliefs, it would prohibit sectarian prayers where there is no clear definition of what constitutes a "sectarian" prayer. To be sure, a prayer that references Jesus is sectarian. But in *Simpson*, we labeled as

nonsectarian references to "Lord of [l]ords," and "King of [k]ings." *See Simpson*, 404 F.3d at 284. Yet, those phrases refer to Jesus in the New Testament. *See* Revelations, 19:15; *see also Marsh*, 463 U.S. at 823 (Stevens, J., dissenting) ("The Court declines to 'embark on a sensitive evaluation or to parse the content of a particular prayer.' Perhaps it does so because it would be unable to explain away the clearly sectarian content of some of the prayers given by Nebraska's chaplain" (internal citation omitted)). Because the way that an individual refers to God and surely the way the individual prays to God are largely informed and influenced by the individual's religious beliefs, it would be virtually impossible to undertake the effort of separating those beliefs that are ecumenical from those that are sectarian. Such a task is "best left to theologians, not courts of law." *Pelphrey*, 547 F.3d at 1267; *see also id.* at 1272 ("We would not know where to begin to demarcate the boundary between sectarian and nonsectarian expressions, and the [plaintiffs] have been opaque in explaining that standard. Even the [plaintiffs] cannot agree on which expressions are 'sectarian'"). Moreover, such a determination is the very "sensitive evaluation" and "parsing" that the Supreme Court prohibited in *Marsh*. 463 U.S. at 795.

In addition, we should not constitutionally mandate that any governmental body supervise the content of prayers given by private individuals. As the Supreme Court explained, when considering a high school and middle school graduation prayer:

> We are asked to recognize the existence of a practice of nonsectarian prayer, prayer within the embrace of what is known as the Judeo–Christian tradition, prayer which is more acceptable than one which, for example, makes explicit references to the God of Israel, or to Jesus Christ, or to a patron saint. . . . If common ground can be defined which permits once conflicting faiths to express the shared conviction that there is an ethic and a morality which transcend

> human invention, the sense of community and pur-
> pose sought by all decent societies might be
> advanced. But though the First Amendment does not
> allow the government to stifle prayers which aspire
> to these ends, neither does it permit the government
> to undertake that task for itself.
>
> The First Amendment's Religion Clauses mean that
> religious beliefs and religious expression are too pre-
> cious to be either proscribed or prescribed by the
> State. The design of the Constitution is that preserva-
> tion and transmission of religious beliefs and wor-
> ship is a responsibility and a choice committed to the
> private sphere, which itself is promised freedom to
> pursue that mission. It must not be forgotten then,
> that while concern must be given to define the pro-
> tection granted to an objector or a dissenting nonbe-
> liever, these same Clauses exist to protect religion
> from government interference.

*Weisman*, 505 U.S. at 589 (striking down prayers at gradua-
tion of "primary and secondary school children," for whom
"the risk of compulsion is especially high," but leaving open
the legitimacy of such prayers in similar circumstances for
"mature adults").

The Establishment Clause surely does not require legisla-
tive bodies to undertake the impossible task of monitoring and
prescribing appropriate legislative prayers for religious lead-
ers to offer as invocations. And it does not require that legisla-
tive bodies demand that religious leaders only offer
nonsectarian prayers. Yet the majority imposes these exact
requirements, with all of its constitutionally suspicious prob-
lems.

In sum, the County's policy for legislative prayer is totally
neutral, proactively inclusive, and carefully implemented so
that the County, in no manner, could be perceived as select-

ing, or expressing a preference for a particular religious leader, a particular religion or denomination, or a particular prayer. In this structure, which was meticulously constructed to follow Supreme Court precedent, our intrusion is nothing short of a compromise of the County's effort to maintain an open and neutral policy.

### III

Prayer includes the articulation of words addressed to the Divine Being in accordance with the beliefs of the prayer-giver's religion. Because how one should address the Divine Being and what one should say cannot be determined by a civil court of law, efforts to do so would inevitably place courts in the untenable role of regulating the content of religious expression.

And to interfere with a prayer-giver's form of address during an invocation is no less intrusive. In the Jewish and Christian traditions, Moses asked God, when receiving the law, how he was to refer to God in relating the law to his people. God told Moses that he must say to the Israelites, "I am who I am" and therefore he must say, "I am has sent me to you." God also told Moses to say to the Israelites, "YHWH [the sacred and unspeakable name of the Lord], the God of your ancestors, the God of Abraham, the God of Isaac, and the God of Jacob, has sent me to you." God concluded, "This is my name forever, and this is my title for all generations." Exodus 3:13-15. Christians call on the Divine Being with the names God the Father, God the Son (Jesus), and God the Holy Spirit. Muslims have 99 names for God, but Allah is the supreme appellation. Yet the majority opinion now directs all religious leaders to forsake these names to accommodate some "civil," court-shaped religion.

Indeed, the majority demands prayers that do not mention Jesus—at least not "four-fifths" of the time; that are not in too close a "proximity" to official government business; that

embrace a "non-sectarian ideal"; that do not create "patterns of sectarian prayer"; that do not "pressure one to stand and bow." Such a position, however, fails to take prayer as the sacred dialogue between the Divine Being and the people, as determined by any given religion represented by the religious leaders of Forsyth County.

Indeed, Joyner and Blackmon's complaint about being pressured to stand and bow during prayer—a complaint that the majority apparently accepts—is not a complaint against sectarian prayer or even against a government preference of a religion or denomination. It is an attack on prayer itself. It is not the sectarian nature of a prayer, or even its content, that creates the subtle coercive pressure of which the plaintiffs complain. It is the allowance of any prayer in the public forum and the respect for it shown by others that leads to this pressure. How the majority, in adopting the plaintiffs' position, protects nonsectarian prayer but, at the same time, condemns the pressure caused by such prayer because the people stand and bow their heads suffers from its own inherent inconsistency.

Forsyth County has not picked any particular prayer—sectarian or not—nor has it favored any particular prayer. Its policy is to have a pluralistic celebration of prayer through which all in the County may solemnize the Board's meetings while at the same time respecting each religion or denomination's form of prayer. And *Marsh* supports this approach. It requires—in an effort to preserve respect for a mutual exercising of religions—that government not permit religious speech that proselytizes, advances one religion over another, or disparages other religions. And for that limited purpose, it directs that the content of legislative prayer be reviewed. *But the review is limited and is designed for the mutual protection of the diverse prayers of a religiously pluralistic society, spoken in accordance with each religion.*

Finally, I note that the majority's logic in prohibiting only an invocation of Jesus during prayers in Forsyth County, but

otherwise allowing other prayer content, escapes me. Prayer includes the invocation of the Divine Being according to the understanding of the religion, not the court. Would the majority thus preclude a Christian prayer invoking the Holy Spirit or Pax Christi or the King of kings? Would the majority deny a prayer invoking the God of Abraham, Isaac, and Jacob? Whatever name is spoken, it is spoken by the religious leader in accord with the leader's religion to call on the Divine Being. Yet we now legislate, based on the imprecise notion of nonsectarianism, bowing to political correctness or universal inoffensiveness and censuring only what offended Joyner and Blackmon on December 17, 2007, without regard to the dangers of governmental censorship of religious expression.

I respectfully submit that we must maintain a sacred respect of each religion, and when a group of citizens comes together, as does the Forsyth County Board of Commissioners, and manifests that sacred respect—*allowing the prayers of each to be spoken in the religion's own voice*—we must be glad to let it be. The ruling today intermeddles most subjectively without a religiously sensitive or constitutionally compelled standard. This surely cannot be a law for mutual accommodation, and it surely is not required by the Establishment Clause.